# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DAVID KEEZER and<br>SCOTT PASCH,<br>a/k/a JAY HENRY SCOTT | : | Case No. 3:13-cv-01191-PGS-TJB |
| | : | |
| Plaintiffs, | : | |
| | : | **FINAL PRETRIAL ORDER** |
| ERROL COPILEVITZ, ESQ. and<br>COPILEVITZ-CANTER, LLC | : | |
| | : | |
| Defendants. | : | |

This matter having come before the Court for a pretrial conference pursuant to Fed. R. Civ. P. 16; and Glenn A. Bergenfield, Esquire having appeared for Plaintiffs, and Paul G. Boylan and Matthew S. Marrone, Esquire having appeared for Defendants; the following Final Pretrial Order is hereby entered:

1. **JURISDICTION:** Plaintiff, David Keezer, is a resident of the State of Florida. Plaintiff, Scott Pasch a/k/a J Henry Scott, is a resident of the State of New Jersey. Defendant, Errol Copilevitz, Esq., is a resident of the State of Missouri. Defendant, Copilevitz-Canter, LLC, has a principal place of business located in Kansas City, Missouri and Washington, DC. Pursuant to 28 U.S.C. §1332(c)(1) full diversity exists among the parties.

2. **PENDING/CONTEMPLATED MOTIONS** (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or to the calendar. Also, set forth the nature of the motion and the return date. If the Court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position).

      A.    Plaintiff's Pending Motions

There are 3 plaintiffs' motions pending in limine rulings:

1. **To bar defendants from introducing any evidence of the 40 state investigations and settlements from 1993 to 2009.** We have argued that this evidence violates Rule 404 (other "bad act evidence") and Rule 403 in that the probative value is negligible and its prejudicial value is great. We also argued that the evidence violates Rule 408 in that settlements are inadmissible, especially

to prove liability. Settlements are inadmissible as a matter of public policy. We also argue that the evidence is largely hearsay and that it raises many collateral issues, including the role of defendant Copilevitz in the 40 investigations.

*Defendants to identify by 9/11/17; any issues to be addressed in trial brief*

    a. Defense counsel advised at oral argument that it only intended to introduce "some" of the 40. The Court told defendants to provide the Court and plaintiff's counsel with documents that related to the ones that counsel sought to introduce.

    b. The Court has not ruled, pending defendants specifying its position and its production of the related documents.

2. **To bar certain opinions of defendants' legal expert, Lustigman.** We have argued that Lustigman cannot testify to the jury as to the meaning of Paragraph X of the 1998 FTC Consent Order, for two reasons. *First,* his opinion is clearly a net opinion. He says merely that *he wouldn't and that he doesn't* give notice to the FTC. *Second,* in defendants' brief that responds to our in limine motions (PACER 61-2 at page 4) entitled "**Expert Testimony as to Para. X Is Impermissible As Testimony As To Law**") they conceded that the meaning of Paragraph X of the FTC Consent Order is a question of law; so both sides think that the Court should decide the meaning of this legal language. *We respectfully ask the Court to rule on this before openings - that the meaning of Paragraph X of the FTC Consent Order is a question of law to be decided by the Court (this is our view) or that it is a question of fact upon which testimony should be taken.*

3. **To bar the expert opinion of defendants' CPA who opines that the money loaned or invested in CDG by plaintiffs was definitely an investment.** Plaintiffs will not try to prove that the money they put into CDG to build out the PMC Model was an investment or a loan. Our theory is that the money was only put in based on the belief that the PMC Model was lawful.

There are also the following unresolved issues:

1. **The issue of whether *In Pari Delicto* could be a defense in this case.** The Court has received many briefs on this topic and heard hours of argument. The Court had ruled that a decision on whether the doctrine could be applicable must await the proofs. The Plaintiffs have tried to find out what evidence of *In Pari Delicto* might be offered; and we opposed them in limine motion number 4, PACER 62-2, by pointing out that the 40 settlements cannot be admissible and that there was no other *In Pari Delicto* evidence to be offered. Please see 1 a and b above.

2. Plaintiffs intend to move to bar defendants from mentioning the doctrine or the theory until the Court rules that the doctrine is a potential defense and, that if it could be, *that there is some admissible evidence that has been identified.*

The following motions are contemplated by the Plaintiffs: *To be addressed during jury instruction charge conference*

1. **To instruct the jury that one item of plaintiffs' damages (of the three) is not disputed and if the jury finds the defendants liable, that amount of damages**

**will be awarded by the Court.** Plaintiffs paid in penalties to the FTC $13,100,000; the defendants do not dispute that payment. Defendants respond to this point as follows. Defendants do not agree that if liability is found, the entire amount of damages automatically gets awarded. For example, the jury could find that defendants were only partially responsible for those damages. Moreover, defendants do not "admit" that Plaintiffs "paid" these amounts, per se. Rather, they forfeited assets which the government accepted in satisfaction of these amounts. The jury is entitled to hear all about this.

2. **If plaintiffs are successful in proving liability, the Court, post-trial, must award plaintiffs' all attorneys' fees and actual costs incurred in the prosecution of this case, consistent with *Saffer v Willoughby*, 143 N.J. 246 (1996).** The Court had previously ruled that *Saffer* is applicable to the damages in this New Jersey case. None of these issues are submitted to the jury.

      B.    Defendants' Pending Motions

Defendants have eight pending pre-trial motions:

     1.    Motion *in limine* seeking to preclude Plaintiffs from introducing certain categories of non-recoverable damages.

     2.    Motion *in limine* seeking to preclude Plaintiffs from offering expert testimony regarding a hypothetical advisory opinion.

     3.    Motion *in limine* seeking to preclude Plaintiffs from introducing testimony regarding a hypothetical notice to the Federal Trade Commission under the 1998 Consent Order.

     4.    Motion seeking a ruling that the *in pari delicto* defense is in issue.

     5.    Motion *in limine* seeking to preclude Plaintiffs from offering the testimony of proposed expert Lewise Goldfarb.

     6.    Motion *in limine* seeking to prohibit Plaintiffs from offering the testimony of proposed expert Neil Richards.

     7.    Motion seeking rulings as to impermissible topics of testimony for Plaintiffs.

     8.    Motion seeking sequestration of witnesses at trial (agreed to by Plaintiffs)

3

3.   **STIPULATION OF FACTS** (Set forth in narrative form a comprehensive listing of all uncontested facts, including all answers to interrogatories and admissions, to which there is agreement among the parties).

The following stipulated facts are the facts from Defendants' Motion for Summary Judgment, which were admitted by Plaintiffs. They are listed in numbered format, for referenced to the Motion:

(Plaintiffs object to this approach by the defendant. These "facts" are a part of defendants' *losing* motion on *in pari delicto*. **The Court has not decided that *in pari delicto* is a relevant defense in this case and, if it is, what evidence is admissible as to that defense.** We have filed motions to bar the defense **and** to have the Court rule that the defendants have no relevant evidence for this defense, if the Court rules that *in pari delicto* is a legal defense. The "facts" noted here may not have been disputed for purposes of the summary judgment; however, that does not mean that the "facts" are admissible or relevant to the trial issues of this case. We note our objections to inadmissible "facts.")

5.    As of 1998, CDG (the "Company") was very successful nationwide in the field of charitable fundraising for police, fire and other not-for-profit or charitable organizations (hereafter together "charity clients").

6.    Plaintiffs David Keezer ("Keezer") and Scott Pasch ("Pasch") were the two principals and co-owners of CDG as of 1998 and at all other relevant times. They were also officers of CDG.

7.    CDG from 1995–2000 was "the largest company" in the U.S. in the field of telemarketing fundraising. It had up to 10,000 employees. From 2002–2006 CDG continued to collect "tremendous revenue" from its operations. *Plaintiffs object to the vague description of "tremendous revenue;" it is also irrelevant to the issues of this legal malpractice case.*

8.    CDG earned profit of $24 million in 2004 and profit of $9.9 million in 2005. For many years, CDG openly described itself as "number one ranked in outbound telecommunications". *This is irrelevant to the issues of this case. And its prejudicial value outweighs its probative value.*

4

10.    In 1998 the FTC commenced a prosecution against CDG, Pasch and Keezer. The FTC 1998 prosecution alleged that CDG fundraising personnel had telephonically misrepresented to numerous consumers that all of certain donations would be used to buy bullet-proof vests for local police and to pay death benefits to survivors of local police, both of which representations were false. *This is true but incomplete. The testimony will show that the charity misused the money raised by CDG, thus rendering the claims untrue. This background is irrelevant to this case and violates Rule 404, 408 and 403.*

12.    The resolution of the 1998 FTC complaint is recorded in a 1998 Consent Order entered against CDG and against Pasch and Keezer individually. Each Plaintiff personally signed the 1998 Order.

14.    The 1998 Consent Order, Exhibit 2, provides in clear terms that it has a duration of 20 years. See Article XIII. By the terms of the 1998 Order, CDG and each of the individual Plaintiffs are liable for any future violations of the Consent Order, including "assistance" or "facilitation" of any misrepresentations during the 20-year duration of the Order.

15.    Plaintiffs admit they at all relevant dates knew or should have known that the 1998 Consent Order could result in personal liability for up to 20 years. *Plaintiffs did admit this paragraph but added this as part of the admission: "The Plaintiffs repeatedly asked Copilevitz if he thought the FTC should be contacted to make certain changing to the PMC model was legal."*

16.    The 1998 FTC Consent Order necessitated that CDG improve CDG's internal controls, compliance, and due diligence systems. Starting with the 1998 Order, CDG always had at least one in-house attorney, sometimes as many as three. The 1998 Order required detailed periodic reporting by CDG to the FTC. Defendants, specifically Errol Copilevitz, were engaged by CDG set up the compliance program and supervise that reporting. The 1998 Order also required the hiring of in-house counsel at CDG and increased in-house compliance personnel in order to review all telemarketing scripts and other detailed steps to assure compliance with the 1998 Order and all FTC rules. *Plaintiffs did admit this paragraph but added as part of the admission: "And add that Copilevitz set up the compliance program; and he was the point of contact with all communications between the FTC and CDG and Plaintiffs."*

17.    These Defendants successfully and effectively supervised CDG compliance with the FTC 1998 Consent Order from 1998 to 2001. Copilevitz was engaged to supervise reports to the FTC required by the 1998 Consent Order. The post-1998 CDG compliance efforts for the FTC included creation and use of an explicit CDG Employee Policy titled "Zero tolerance for Misrepresentation."    That "zero tolerance" policy was enacted while Copilevitz was actively working with Plaintiffs as to FTC reporting obligations under the 1998 Order. *This is largely irrelevant to the issues of this case.*

5

18.    Because of the excellent FTC compliance work by Copilevitz after 1998, the
FTC in 2001 excused CDG early from the reporting requirements of the 1998 Order.
Plaintiffs and CDG were not excused from any other obligations under the 1998
Consent Order.

20.    CDG's implementation of consulting services started in Indiana in February
2004.

23.    Plaintiffs by January 2004 abandoned the initial strategy of caution. Pasch,
instead, wanted to enter into as many as 150 consulting service relationships as soon
as possible. Plaintiffs by early 2004 decided to "migrate as many clients as possible
at any and all costs."   CDG in 2004 began to do consulting nationwide and very
rapidly.   Pasch thought consulting services would perform "very very" well
financially for CDG.   Pasch and Keezer viewed consulting as "the future" of
charitable telemarketing.   Pasch thought consulting would "grow my business."
Plaintiffs thought it would yield more revenue for the clients and for CDG, allow
"more accurate" public presentation of charity expenses, and was the "future of the
[charity telemarketing] business." "The rewards far outweigh the risks," Pasch wrote.
Pasch and Keezer in 2004 "knew exactly what we were doing business-wise" as to
the roll out of consulting services.

25.    The operational details of consulting by CDG starting in 2004 involved
complex factual components.  ***This is a meaningless conclusion, not a fact at all.***

26.    Consulting was introduced in forty states and to multiple charity clients in
those states. Copilevitz over several years successfully negotiated with multiple State
Attorney Generals for acceptance of consulting in various versions and for
registration of CDG as a consultant in all of those relevant states.

27.    Between 2004 and 2007, charity consulting clients of CDG made over 189
million telephonic calls to consumers.

29.    Donations collected from consumers nationwide by CDG clients using the
consulting services grew very quickly:  $5.6 million in 2004, $37.9 million in 2005,
$90.4 million in 2006, and $108.7 million in 2007. Complaint, para. 14.   Those
amounts add up to total of over $250 million. ***This is irrelevant to any issue in this
legal malpractice case and the prejudicial value of this outweighs its probative
value.***

31.    Starting in 2004 in Indiana and all later dates, the CDG consulting services for
each client were each slightly different from each other. Each consulting agreement
was custom-tailored.   "The precise scope of consulting services provided by CDG
varied based on the individual needs of each client." ***This is a meaningless
conclusion, not a fact.***

33.    During the roll out of consulting services and until the 2007 FTC civil
prosecution, Plaintiffs Pasch and Keezer in 2004-2007 personally became less and
less involved in management of CDG day-to-day operations.  They hired a Chief

6

Operating Officer, Alyce Cucurullo, to manage the operations of the business. Ms. Cucurullo reported directly to the Plaintiffs. Pasch says that by "the early 2000s, we (CDG) had a lot of employees, things were going well . . ." Because of that, Pasch after 2000 was not involved in CDG operations, or human resource issues, or CDG compliance obligations as to the FTC or others. Pasch in that time limited his role to "guiding the company" and "making the big decisions." *This is irrelevant and contains conclusions and not facts.*

34.    Starting in 2001, after being diagnosed with cancer, Keezer was "less and less" involved with the CDG business. *This is irrelevant to any issue in this case.*

35.    In 2004, the year CDG started to do consulting, Plaintiff Keezer moved to Florida where CDG had no offices. Recovering from cancer, Keezer thereafter did no work at CDG for six months a year. In 2004, Keezer and Pasch each were paid salary of $10.5 million by CDG. In 2005, they each were paid salary of $5.8 million. Keezer from 2004-2007 spent all winters entirely in Florida, and was present in New Jersey for summers only.    In the summer months, Keezer went to the CDG offices two or three times a week. Keezer from 2004-2007 seldom, if ever, visited any of the several call centers at which the CDG charity consulting clients were soliciting funds by phone. Pasch after 1999 never visited <u>any</u> call centers of any charity consulting clients. *This is irrelevant -- especially what Plaintiffs were paid -- and prejudicial.*

36.    While recovering from cancer, Keezer in 2004-2007 never saw any budget documents for CDG. Keezer in ordinary course never spoke to in house CDG personnel responsible for the consulting services (e.g. Kachur, Farley) named by the FTC in 2010 as key FTC trial witnesses against Plaintiffs. Pasch and Keezer at all relevant dates, in addition to CDG, also owned and ran a separate telemarketing company, Millennium Teleservices, which did telemarketing for Bank of America and other very large financial service companies. *This is irrelevant to any issues in this case and violates Evid. Rule 403.*

37.    Starting in 1994 and at later dates including multiple dates prior to July 2007, CDG and occasionally the individual Plaintiffs were the subject of approximately forty (40) separate state Attorney General ("State") or FTC prosecutions based on allegations of misrepresentations by CDG in solicitations of funds as either a fundraiser or as a consultant or based on other unlawful conduct. Defendants successfully resolved all those state law enforcement actions as the attorneys for CDG. All actions were resolved with no finding or admission of wrongdoing. *This is the subject of our various in limine motions, violating Evid. Rule 404, 408 and 403. It also violates the instruction of the Judge that defendants make clear which of the 40 they think are admissible and to provide to the Court and plaintiff's lawyer the papers that go along with that. It is also irrelevant to the issues of this case.*

38.    Plaintiff Pasch in 2015 testified that his personal opinion was that none of the numerous state prosecutions of Plaintiffs or CDG prior to 2007 had any merit. *This is the subject of our various in limine motions, violating Evid. Rule 404, 408 and 403. It also violates the instruction of the Judge that defendants make clear which of the*

*40 they think are admissible and to provide to the Court and plaintiff's lawyer the papers that go along with that. It is also irrelevant to the issues of this case.*

39.     Excluding the 2007 FTC Complaint, the state law prosecutions were of little merit and were successfully resolved by negotiating the entry of consent judgments and payment of penalties or fines. CDG prior to 2007 paid total penalties of about $1.4 million in the collateral prosecutions.  Defendants performed this service for CDG and incidentally for Pasch and Keezer as officers when they were personally named defendants in state or FTC prosecutions.   No Plaintiff alleges that any substandard legal advice by any Defendant caused any of those forty state or federal collateral prosecutions.  *This is the subject of our various in limine motions, violating Evid. Rule 404, 408 and 403.  It also violates the instruction of the Judge that defendants make clear which of the 40 they think are admissible and to provide to the Court and plaintiff's lawyer the papers that go along with that. It is also irrelevant to the issues of this case.*

42.     Plaintiffs admit that Defendants never advised CDG or the Plaintiffs to encourage or allow misrepresentations by persons working as telemarketers in consulting services or otherwise. However, when callers said they were calling as employees of the charity, this was a misrepresentation because the PMC model was a sham.

43.     Plaintiffs admit Defendants never gave CDG or the Plaintiffs any advice to do anything illegal as to consulting or otherwise.  *Except of course for all the advice that Copilevitz gave that turned out to cause illegal activity.  It is also irrelevant to the issues of this case because we do not claim Copilevitz told plaintiffs to lie..*

52.     Under Paragraph VIII of the 1998 Consent Order, and separately under the TSR, Plaintiffs as of 2004 were prohibited from providing the means or instrumentalities or otherwise "assisting or facilitating" any person who they "knew or should have known" was making false or misleading representations.   Ex. 2 Consent Order, Para VIII.

53.     As of 2007 the FTC by its Complaint and pleadings alleged 189 million telephonic calls of which millions were alleged to be misrepresentations in violation of the Consent Order, the TSR, and the FTC Act.  The FTC sought penalties of at least $250 million against each Plaintiff based on the donations received.

56.     Defendants never advised Plaintiffs to ignore telephonic misrepresentations at the call centers. *We admitted this but added to our admission: "But the problem was that, according to the FTC, the callers were misrepresenting themselves when they told donors that they were employees of the charity; the FTC alleged this was a misrepresentation."*

61.    CDG, based on advice by Defendants, before any consulting in any state, registered as a consultant in that state.

62.    Plaintiff Keezer knew based directly on Copilevitz advice that with the consulting model, the charity call centers, not CDG, were intended to do the actual solicitations.

71.    Unknown to CDG, the FTC, in 2005 commenced a lengthy and effective undercover investigation of CDG's implementation of the consulting services in 2005 and later years. The FTC undercover investigations by mid-2007 showed that the charity clients counseled by CDG were making telephonic misrepresentations in many of the 189 million calls nationwide. *We admitted that the FTC conducted an investigation but we deny any characterization of it.*

72.    The FTC undercover investigation found evidence of CDG control of the charity callers after 2005.

76.    By July 2007, the FTC informed CDG that it was considering civil prosecution of CDG and Plaintiffs.

77.    CDG and the individual Plaintiffs immediately called Mr. Copilevitz to ask that he attempt to informally resolve the 2007 FTC matter in August 2007, suggesting substantial changes at CDG. The FTC refused any compromise. It commenced the prosecution of the corporation and two individuals on September 24, 2007.

78.    Counts 1 and 2 of the 2007 FTC Complaint alleged that Defendants made material misrepresentations in connection with soliciting charitable contributions, in violation of Parts I and III of the FTC 1998 Order ("Order"). *This document should not be characterized but instead, introduced.*

79.    Count 3 of the FTC Complaint alleged that CDG provided the means and instrumentalities, or otherwise assisted and facilitated thousands of material misrepresentations in connection with soliciting charitable contributions in violation of Part VIII of the 1998 Consent Order. *This document should not be characterized but instead, introduced. Moreover, we wrote a long reply to this "fact." We said: "This is the problem. The FTC alleged that CDG either made the misrepresentations or facilitated the making of them. The PMC Model was so flawed that the FTC could argue it either way, CDG did it or facilitated others doing it."*

80.    Contrary to the legal advice given by Errol Copilevitz, Counts 4-7 of the FTC Complaint alleged that Defendants violated the Telemarketing Sales Rules. A "telemarketer" is defined by the Telemarketing Sales Rule as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(bb). *This makes no sense as a fact. This also describes the law and not facts. This model was why plaintiffs got sued. Moreover, we added this to our reply: "Plaintiff's expert makes clear that Copilevitz*

*was worng when he told CDG that it would not be subject to the TSR if it were a consultant."*

81.    At least 189 million telephonic solicitation calls were allegedly made by charity call centers using the CDG consulting services.  The FTC alleged that illegal misrepresentations attributed to Plaintiffs were used to raise more than $250 million in gross donations.   The FTC 2007 Complaint sought penalties of at least $250 million from each Plaintiff. *This is repetitive.*

82.    The FTC in 2007 alleged misrepresentations from 2004–2007 in numerous instances, in multiple states.  It alleged CDG failed to prevent or to adequately control or supervise charity call personnel solicitations to the public.  The FTC alleged that a lack of diligence by CDG and the absence of proper controls led to telephonic misrepresentations to millions of consumers in multiple states.  Misrepresentations were the core subject of the FTC 2007 complaint and prosecution. *These allegations are in the FTC complaint and are not admitted facts.  What was admitted is this is what the FTC claimed.*

83.    The 2007 FTC civil action alleged that CDG and its principals, the Plaintiffs, violated the 1998 Consent Order, the FTC Act and the TSR based on misrepresentations to consumers when CDG charity consulting clients did telephonic fundraising. *These allegations are in the FTC complaint and are not admitted facts. What was admitted is this is what the FTC alleged.*

86.    All Defendants in the FTC litigation (including the two individual Plaintiffs here) in 2007 hired as their primary FTC defense attorneys the Lowenstein Sandler firm ("the Lowenstein Firm").  That firm is respected and competent.  It was capable of handling discovery, trial, and all aspects of the defense to the 2007 FTC prosecution. Errol Copilevitz was admitted to the defense team pro hac vice in late 2007. When he was named by the FTC as a potential witness, Mr. Copilevitz withdrew.

88.    The 2007 FTC allegations against these Plaintiffs which led to the 2010 settlements predominantly alleged personal liability for millions of telephonic misrepresentations to consumers.

89.    When the FTC files an enforcement action, it issues a press release outlining the key assertions in its case.  Here the September 27, 2007 FTC press release headline was "FTC Charges New Jersey Telephone Fund-Raisers with <u>Misleading Consumers</u> Nationwide About How Charitable Donations Will be Used," Ex. 14 (emphasis added). The FTC 2007 press release began:

The Federal Trade Commission today announced a complaint seeking civil penalties against a New Jersey-based telemarketer <u>that allegedly made misrepresentations to consumers</u> when fund-raising for police, firefighter, and other non-profit organizations, in violation of a 1998 stipulated order and the Commission's Telemarketing Sales Rule (TSR).

According to the FTC, although the stipulated order and the TSR bar the defendants from making any misrepresentation that would be material to a consumers' decision whether to make a charitable donation, the defendants mislead consumers by telling them that defendants' telemarketers work directly for the charities for which they are calling, that consumers' donations would be paid to the charities, and that "100%" of the consumers' donations would go to the charity.

Counts I, II, IV and V of the 2007 complaint alleged that the CDG parties made material misrepresentations to consumers about the purpose of the donations. Count III of the 2007 complaint alleged that CDG parties assisted charities in making the same misrepresentations. The remaining counts charged the CDG parties with failure to comply with technical aspects of the TSR, such as transmittal of caller ID information and failure to discontinue calls when requested. *We admitted this: "This was the press release." This is irrelevant to the issues of this case and it constitutes inadmissible hearsay.*

90. The FTC 2010 post-settlement press release also emphasized that the 2007 FTC case was dominantly based on telephonic misrepresentations to consumers. The March 31, 2010 FTC press release headline was "Defendants Deceived Consumers into Believing All Donations Would Help Local Police, Firefighters, Veterans." *We admitted this: "This was the press release." This is irrelevant to the issues of this case and it constitutes inadmissible hearsay.*

92. The FTC prosecution dominantly involved allegations and detailed unfavorable facts as to misrepresentations attributed to Plaintiffs and to CDG. The primary misrepresentation was that the callers worked for the charities.

93. The 2010 settlements were agreed to by each Plaintiff with the advice of independent competent counsel, the Lowenstein Sandler Law Firm ("the Lowenstein Firm"), a well-respected New Jersey law firm, and the Sidley Austin law firm, and, as to Mr. Keezer alone, a skilled FTC attorney, Barry Cutler, hired by Mr. Keezer alone.

94. Each Plaintiff entered into the individual 2010 settlements because the FTC evidence showed a substantial chance of proving liability of the individual Plaintiffs under one or more of the TSR, the 1998 Consent Order, or the FTC Act.

95. The 2010 FTC settlements were a rational solution to very strong FTC evidence of telephonic misrepresentations nationwide by the charity call centers and the risk of liability to disgorge $250 million. The millions of misrepresentations to consumers were alleged to be attributable to each Plaintiff and other persons. *Objection as inadmissible opinion testimony.*

96. The Plaintiffs and the Lowenstein Firm by late 2009 came to view the adverse FTC evidence as very strong. The lead Lowenstein trial attorney (Mr. Oliver) described the disclosed FTC evidence as to the Ohio-DVA as so strong that it alone would, if used by the FTC, result in summary judgment against Pasch personally.

The damaging Ohio-DVA evidence is not connected to any alleged legal advice by Defendants. *Objection to hearsay.*

97.     Just prior to the settlements, on January 7, 2010, the former CFO of CDG [Ms. Cucurullo] told Keezer and the Lowenstein Firm that her trial testimony <u>alone</u> "would result in personal liability" of Plaintiff Keezer at the approaching FTC trial. *Objection to hearsay. We admitted that Alyce Cucurullo thought this. Ms. Cucurullo's opinion implicated the legal advice given to the Plaintiffs by Errol Copilevitz. And we added that portion of the email from which this assertion was made.*

98.     Keezer agrees that testimony by the former CFO would have resulted in his personal liability at a trial of the 2007 FTC Complaint because the CFO reported to Keezer, he owned CDG, he was a person in charge, and he was personally "aware of a lot of what was going on" with the CDG consulting services. *Inadmissible as a hypothetical opinion by a non-lawyer about a legal finding that might have occurred based on hearsay.*

99.     The Ohio-DVA documents were disclosed by the Government (FTC) in late September of 2009.  The Lowenstein Firm described the Ohio-DVA documents as presenting "significant challenges" to the defense.  Mr. Pasch told the Lowenstein defense team, "OMG . . . I can't believe how bad" the FTC Ohio-DVA evidence would be for him at the FTC trial.  Days prior to his 2010 settlement, Pasch told his FTC defense team:  "[It is] unbelievable that [the FTC is] going to make their case [against Pasch] mostly on Ohio-DVA which is not good for us."  Pasch could "only hope Pam Seman doesn't show up" [to testify for the FTC at trial].  *Inadmissible as a hypothetical opinion by a non-lawyer about a legal finding that might have occurred based on hearsay.*

100.     The unfavorable Ohio-DVA evidence included testimony by Ms. Seman on February 1, 2007 that CDG sold consulting services to Ohio-DVA by saying the roles of the parties under new [consulting] model would be "all the same" as in the fundraising model except that all Ohio-DVA employees would be paid using the Ohio-DVA tax identification number.  CDG agreed to serve as a consultant to Ohio-DVA, the charity client, on July 5, 2005.  In doing so CDG agreed that Ohio-DVA (the charity) would have sole discretion as to hiring, termination, and training of all Ohio-DVA employees.  In fact CDG <u>prohibited</u> Ohio-DVA from having any voice in those issues ("They block us, basically.")  CDG, not Ohio-DVA, prepared all scripts used by Ohio-DVA to solicit donations by telephone.  When Ms. Seman protested, CDG told her that CDG would refuse to indemnify Ohio-DVA under the consulting agreement if Ohio-DVA did not yield control to CDG.  *We added this to our admission:  "This is a fine example of the liability conundrum: Ohio DVA wanted to do things its own way and not listen to CDG, but CDG would nevertheless be held liable for anything that Ohio DVA did.  Inadmissible as an opinion about hearsay."*

102.    In 2008, prior to the FTC disclosure of the Ohio-DVA evidence, the lead trial lawyer for the Lowenstein Firm had predicted that Plaintiffs would prevail against the 2007 FTC allegations, advising Plaintiffs in May 2008, that the Lowenstein Firm "would love to try this case." *Inadmissible as an opinion about hearsay.*

104.    As the 2007 FTC case drew closer to trial in late 2009, and because CDG at that point in time was insolvent, the FTC prosecution by late 2009 focused solely on the individual liability of Pasch and Keezer for penalties.  The potential penalties by one calculation were at least $250 million—the amounts collected.  Pasch recalls that the FTC wanted "hundreds of millions" of dollars.  That gigantic economic exposure was "absolutely" one reason Pasch settled in 2010.

105.    Each Plaintiff in early 2010 chose to settle.  In early 2010 Keezer, after consulting with attorneys other than Defendants, entered into a settlement agreement with the FTC whereby he paid a fine of $6.8 million using personal assets.  Keezer retained a house worth $7.35 million and about $700,000 in cash.  *Objection to the irrelevance of the value of his house and assets remaining.*

106.    Pasch about one month later, after consulting with attorneys other than Defendants, entered into a settlement agreement with the FTC to pay a total fine or penalty of $6.3 million using personal assets.  Pasch retained a house worth about $4 million and about $400,000 in cash.  *Objection to the irrelevance of the value of his house and assets remaining.*

107.    The 2010 settlements by the two Plaintiffs were voluntary.  Each settlement was far better than the potential $250 million penalty.  There was no FTC trial and no finding of wrongdoing by either Plaintiff.  Either Plaintiff could have chosen to test the FTC allegations by trial.  *Objection in that these are not facts.*

108.    No allegations in the FTC Complaint were proven on the merits.

110.    The FTC (Government) discovery of very damaging evidence of improper control of charity solicitations (e.g. Ohio-DVA) was independently a very strong cause of the 2010 settlements.  *We added this to our admission: "The Plaintiffs had an indefensible case and they had to settle."*

111.    The Ohio-DVA evidence and testimony and the clear prospect of fatal testimony by Ms. Cucurullo were factors causing each Plaintiff, respectively, to wish to settle and avoid a much larger penalty after trial.  *Object to these opinions about "fatal" evidence.*

112.    The physical and mental condition of Mr. Pasch was a separate strong cause for Plaintiff Pasch to settle.  In January 2010, just before the scheduled FTC trial, Mr. Pasch told the Lowenstein Firm he needed to enter a rehabilitation facility for 30 days to address long standing personal substance abuse issues.  Pasch asked the

13

Lowenstein Firm to seek delay of trial. *Object to this unnecessary and mean-spirited mention of this.*

113.    Plaintiffs' unwillingness or refusal to personally pay the legal fees requested by Lowenstein Firm just prior to trial was another strong practical reason to settle. Just before trial in 2010, significant legal fees were requested or owed.    The Lowenstein Firm requested that the Plaintiffs personally post a retainer balance of $350,000 before trial.  Plaintiffs instead paid a much smaller amount and asked the Lowenstein Firm to prepare for trial at "bare bones expense".  The Firm rejected that request.

116.    Pasch and Keezer until this civil action commenced in 2013 were openly friendly with Defendants, particularly Mr. Copilevitz.  In June 2011 Pasch e-mailed Copilevitz to say Pasch was "18 months sober" and was hoping Copilevitz might invest with Pasch in a startup company Pasch was forming.  Pasch said the new investment venture "just might be HUGE economically."    *We object to this meaningless assertion.  It is not relevant of Copilevitz gave poor legal advice inconsistent with the standard of care.  It may be that Copilevitz and Pasch were friendly.*

117.    Keezer in December 2011 exchanged a series of cordial e-mails with Copilevitz which include holiday greetings. *We object to this meaningless assertion. It is not relevant of Copilevitz gave poor legal advice inconsistent with the standard of care.  It may be that Copilevitz and Pasch were friendly.*

118.    Prior to this 2013 Complaint, there is no record of any written or oral complaint by either Plaintiff from 2007–2013 criticizing any legal advice by any Defendant. *We object to this meaningless assertion.  It is not relevant of Copilevitz gave poor legal advice inconsistent with the standard of care.  It may be that Copilevitz and Pasch were friendly.*

119.    Pasch asserts that Copilevitz continued to be his attorney after 2010 after CDG was bankrupt. *This is irrelevant to this case.*

120.    Pasch says he first thought about suing Defendants starting in 2013.  *This is irrelevant to this case*

121.    Keezer had no thought of suing Copilevitz until he was approached by Pasch in 2013 to join with Pasch in a possible malpractice claim which Pasch, starting in 2013, proposed to pursue.    This lawsuit was not on Keezer's "radar" until Pasch called Keezer.  Keezer was "kind of surprised" by the call. *This is irrelevant to this case*

4.     **PLAINTIFF'S CONTESTED FACTS** (State separately for each plaintiff.

Proofs shall be limited at trial to the matters set forth below. Failure to set forth any matter

shall be deemed a waiver thereof).

Plaintiffs intends to prove the following contested facts with regard to
liability:

In 1998, the Federal Trade Commission (FTC) claimed that CDG had made
misrepresentations in a telephone fundraising drive it had done for a charity that did
not use the proceeds of the drive for the uses it had advised CDG it would use them
for.  Copilevitz negotiated with the FTC and advised CDG, Keezer and Pasch to sign
a Consent Order to settle the FTC's complaints.  Copilevitz was the lawyer for CDG
and the 2 plaintiffs, individually.

The Consent Order, at Paragraph X, states that, among other things, the signers of the
Order: **[S]hall notify the [Federal Trade] Commission at least 30 days prior to any
change in the corporation(s) that may affect compliance obligations arising under
this order . . . .**

The Consent Order also contained a paragraph that made the signers liable if they
assisted or facilitated any violations of the Order, the FTC Act or the Telephone Sales
Rules. The relevant portions of the Order and the fact of FTC jurisdiction over the 3
parties had a duration of 20 years. Keezer and Pasch, agreed to be personally liable for
any violations of the Consent Order.  Copilevitz signed the Consent Order as attorney
for all "respondents."

On October 1, 2003, the "National Do Not Call List Registry" was begun by the FTC
as part of the Telephone Sales Rules (TSR) (16 C.F.R. §310).  These rule changes
impacted the business of CDG.

In 2003 Copilevitz advised Keezer and Pasch that the TSR applied only to
professional telephone fundraisers; he added that he had other clients who since the
1990's were acting as "consultants" to the charities, and, in his view, therefore, were
not telephone fundraisers subject to the TSR or even to FTC jurisdiction.   In
Copilevitz's view, if the "consultants" were only assisting the charities in making the
calls, they could not possibly be subject to the TSR.   Copilevitz told Keezer and
Pasch that if they changed their business model to the Professional Marketing
"Consultant" (PMC) Model that Copilevitz used with his other "consultant" clients,
CDG, too, would no longer be subject to the TSR and that the FTC would have no
jurisdiction over them.  Copilevitz told the plaintiffs that the states and not the FTC
regulated consultants to charities -- that the FTC had no jurisdiction over consultants
or charities.

Copilevitz directed the creation of the first consulting arrangement that CDG entered
into with the Indiana FOP.  Copilevitz provided the legal advice as to the issues,

sought input from the Indiana attorney General as to how to create the program in a way satisfactory to the AG.  He did all the legal work necessary to gain the approval of Indiana.  Copilevitz structured all characteristics of the Model and wrote all necessary contracts.  In the Copilevitz-designed plan, the callers were to become "bona fide" employees of the charities and be assisted in many ways by CDG.

The difficulties of this plan were many – though Copilevitz failed to give advice about that.  The charities were not sophisticated in doing their own money raising.  They had to rely on CDG for most things – e.g. calling lists, equipment, training of employees, all human resource functions and much more, all outlined in the FTC case against CDG brought in 2007. The extreme reliance on the expertise of CDG made the arrangement a "sham" and made the basic claim made by each caller -- "I am an employee of the [charity]" – a misrepresentation.

The Model had other problems.  CDG could not control the callers and the scripts, hiring and firing because to do so would show that CDG was the employer and the role of CDG as consultant was a sham.  Conversely, if CDG did not exercise control over the callers and the calls, CDG would be liable for any misrepresentations anyway, under the assist and facilitate section of the FTC Order and under the TSR.

Alyce Cucurullo, CEO of CDG, had concerns about whether the change to the consulting model that Copilevitz was advising about was consistent with the FTC Order and with all applicable law.  Cucurullo also was concerned as to whether the FTC had to be notified; and she raised those concerns with Copilevitz *before* the rollout of the first consultant model (in Indiana in February 2004).  Despite the clear language of the FTC Consent Order, Copilevitz told them consistently that they "weren't required" to notify the FTC.  Copilevitz has many times made clear to CDG and the Plaintiffs -- before and after the rollout of the consultant model -- that this was his belief.   He advised the principals of CDG that as to the FTC, it had no jurisdiction over this activity and that as to notice, it was best to "let sleeping dogs lie."

On May 9, 2003, 10 months before the "consultant" business started, Alyce Cucurullo, CFO of CDG wrote an email to the Plaintiffs raising several questions, including this one:  **Regarding the FTC [Consent] Order, is there anything that could prohibit or limit our ability to engage in this type of consulting for a client for fundraising purposes?**

Scott Pasch, told Alyce to **"talk to Errol directly"** on that.   Alyce called Errol Copilevitz three days later on May 12, 2003 and handwrote onto her copy of the email, Errol's answers to the questions. **"Do we ask FTC to review?"**  Copilevitz gave Alyce advice that there was no reason to involve the FTC.

On January 28, 2004, Alyce again asked if the FTC Consent Order might be applicable.  She wrote to Copilevitz: **Will this type of arrangement remove the state disclosures as well as the FTC order requirements?**  Copilevitz replied: **My gut is yes . . . you are not soliciting.**

16

Copilevitz gave again the same advice, in advance of the rollout of the consultant model. And he even gave that advice after the FTC sued the plaintiffs in 2007.

The constraints of the FTC Consent Order and FTC jurisdiction over the activity of Pasch, Keezer and CDG were applicable to the Consultant Model. The legal advice that was given by Copilevitz as to all of these topics was entirely wrong. The FTC should have been notified, the FTC had jurisdiction over these plaintiffs and over the activity. And due to the Copilevitz design of the PMC model, CDG and plaintiffs were liable for misrepresentations made by the callers, anyway. The many mistakes in the Copilevitz advice are described in our two expert reports.

This incorrect legal advice was repeated many other times.

If the FTC had been notified it would have said in 2003 what it said in 2007 when it sued CDG and the Plaintiffs: The FTC still had jurisdiction over CDG despite the change to "consultant." The plan provided for too much control by CDG such that the employees of the charity were in fact employees of CDG. Based on all the things that the FTC later sued about, the PMC Model was a sham.

On February 3, 2004, CDG was rolling out in Indiana the first consultant model for a charity-client. Alyce wrote to Copilevitz's secretary, Noeline Studdard, and said this: **I have an important question for Errol – would the FTC order and the FTC violation apply to Indiana?**

Copilevitz was out of the office and Studdard asked if Copilevitz Canter partner Greg Lam could answer the question. Alyce said that was fine, "If he was familiar with our FTC order." Lam's email in response suggested that parts of the Consent Order might apply but if the callers did not make any misrepresentations, "it should not be problematic." What Lam failed to see was that the entire PMC model was a sham.

Alyce remembers Copilevitz saying in a telephone conversation that as to notifying the FTC and getting its approval -- "Let sleeping dogs lay."

On October 28, 2004 Alyce wrote this to Keezer and Pasch: **. . . I am very concerned that we are moving too quickly and somewhat blindly. I do not feel like we have gotten any meaningful legal opinion about the risks and more importantly what the worst-case scenario can be . . . . Errol's opinions and advice do not always give me the comfort level, including the belief system that the worst case scenario is simply a rollback to the PFR [The Professional Fundraising Model] . . . . most importantly, what would happen if a state or the federal government stepped in and deemed this model smoke and mirrors . . . would they revert us to the PFR or could they shut us down completely?**

From 2004 until 2007 Copilevitz provided legal advice for the rollout in other states of further PMC models. Copilevitz did all the legal work necessary for these rollouts. He reviewed scripts, wrote sub leases, and contracts with the charities, and gave advice about what was a "bona fide" employee and in other areas that proved to be violations to the FTC.

17

Copilevitz never gave in this period any advice that the FTC should be consulted, that the FTC had jurisdiction, that the model might be viewed as a sham. And he never advised Pasch or Keezer that they faced immense personal liability to the FTC if the FTC did have jurisdiction and if the model was seen as a sham

In July, 2007 Copilevitz was contacted by the FTC and invited to Washington, DC to discuss the FTC view of the "change" to the consultant model that CDG had implemented without notifying the FTC consistent with the Consent Order. After the meeting, Copilevitz wrote an August 8, 2007 memo to his clients analyzing the issue with a bit more nuance and care than he had used in 2003 and 2004. He wrote -- as to the question "regarding whether certain provisions [of the FTC Consent Order] continue to apply" he said this: "some [paragraphs] are still in affect." And he concluded with: "The application of the requirements to the PMC model are unclear. In my experience regulators always view their rights as expansive."

On October 31, 2007, Copilevitz began the defense of CDG in the FTC case. He prepared a memo that stated CDG "is not a professional fundraiser" and State and not Federal law define CDG's role as a consultant to charities. He concluded: CDG, Pasch and Keezer "should not be at peril based on a new, contradictory interpretation of federal law by the FTC."

Lowenstein Sandler attorney Carl Greenfield wrote to his partners, Matthew Oliver and Michael Himmel concerning that memo: **We should be very careful about relying on the research in this memo. My brief review indicates a number of problems or errors in the research and or the way the facts are presented.**

In November 2007, Copilevitz also expressed to co-counsel Lowenstein Sandler the view that the FTC had no jurisdiction over what CDG was doing because they were not telephone solicitors anymore but, instead, consultants to charities -- and the charities are not regulated by the FTC.

On July 18, 2008 Copilevitz wrote a memo to Matthew Oliver of Lowenstein Sandler: **While the laws of the states regulating nonprofit fundraising are extensive, the FTC has no such jurisdiction. As aforenoted, how can CDG be accused of wrongful conduct when it acted in compliance with the laws of the states that regulate the activity in the case at bar?**

Copilevitz wrote another memo to Oliver a week later: **As "consultants" the Court needed to understand "that while the FTC objects to the arrangement, it is provided for by state law."**

During discovery in the FTC case, CDG claimed that Copilevitz had been the one who set up the Professional Consultant Model to insure that CDG was compliant with whatever the FTC required. That was one of the primary defenses and the plan was to give it voice through Copilevitz. Copilevitz was offered by CDG as a witness in the case for this purpose: **Defendants stated that they intend to prove that CDG's outside counsel provided counsel and guidance concerning CDG's compliance**

**with Federal, State and local statutes ... as well as compliance with the FTC Consent Order.** He was also offered as a witness to testify that he established the "design, viability and implementation of the PMC model."

CDG, Keezer and Pasch were subject to the Consent Order and the FTC had jurisdiction over anything they did for 20 years after 1998. It might be that a consultant to a charity that made intrastate calls, only, and was not subject to an FTC Consent Order, would not be subject to FTC jurisdiction. But CDG was not that company; it, and its principals, had signed a Consent Order that brought it within FTC jurisdiction, no matter what its next business iteration was.

For twenty years, until February 23, 2018, the Plaintiffs were under the terms of the Consent Order. And under that Order, they had a legal requirement to notify the FTC of the change to their business, the new business model. And if they had done that, the FTC would have said in 2003 what it sued CDG, Keezer and Pasch for in 2007 -- the Copilevitz-designed PMC Model was a sham designed to avoid the TSR and the 1998 FTC Consent Order.

Copilevitz had a discussion with the Plaintiffs as to whether they should notify the FTC: but **"the decision was made that it wasn't necessary;"** we **"weren't required to do it;"** and **"let sleeping dogs sleep"**.

On March 29, 2010, after almost 3 years of litigation and millions in legal fees, the Plaintiffs entered into a settlement with the USA, agreeing to a fine of $18,600,000 and a lifetime ban from working in the telemarketing or charitable solicitation industry.

The PMC Model created an irresolvable problem for CDG. If the callers [who were employees of the charities] were controlled by CDG -- for example, what they said in the telephone solicitations -- then CDG was actually still the "telemarketer" and the change from "telephone fundraiser" to "consultant" was a sham. The FTC claimed this was the case.

If CDG did not control what the callers said and did in the solicitations (e.g. by scripts, training, legal advice as to how to act and when to call, and authority to fire for misbehavior), then the callers undoubtedly would make misrepresentations. And CDG would be responsible for any misrepresentations made by the employees of the charities. The 1998 Consent Order Part VIII made CDG responsible if it: **provided means and instrumentalities to, or otherwise assist or facilitate any person who respondents know or should know makes false or misleading representations ...**

The "assist or facilitate" prohibition was further defined very broadly, including but not limited to: **providing or arranging for ... the provision of telephone service or equipment; [or] the provision of computer hardware or software; Providing or assisting in the development of telephone scripts or other marketing material; Mailing or arranging for the mailing of any solicitation or marketing material; or Providing or arranging for the provision of names of prospective contributors.**

19

CDG did all that. The nature of the "consulting" was to provide the telephone equipment, the scripts and the names for the call lists. CDG also provided locations, training, computer hardware and software, all that. The FTC claimed this was the case, as well.

Copilevitz knew that the scripts and the Q and A contained claims that "100% of the money raised" went to the charities. He several times wrote that the claim was true. The FTC found this to be a misrepresentation.

CDG was either a "telemarketer" that controlled the money raised, and the business and the change to "consultant" was a sham that violated the Consent Order and the TSR; or CDG was a "consultant" but it was still responsible for all the conduct of people raising the money -- and when they made misrepresentations, CDG was in violation of the Consent Order and the TSR. Either one was a winner for the FTC.

**Regarding the loss of evidence:**

In December 2009, Errol Copilevitz's desktop computer would not boot up. At that point, all of Copilevitz's email written as a lawyer was stored in only one place -- on the hard drive of this personal computer.

Copilevitz and Canter had an IT person on staff, Jill Moore. She was deposed in this case.

Moore told Copilevitz that this was the only copy of his emails that existed and further that if she wiped the hard drive, it would permanently delete all emails.

Copilevitz told Moore to go ahead and wipe the hard drive of the emails. Moore testified that she never would have gone ahead and wiped the hard drive of the emails if Copilevitz had asked her not to do so.

During discovery in the FTC case, the court ordered that the plaintiffs enter into a Joint Core Discovery plan and were required to provide all documents, including "electronic correspondence, sent to or received from any of the organizations regarding the transition from a PFR contract to a PMC contract..." Errol Copilevitz and William Raney are listed on the plan as being Of Counsel. In addition, Copilevitz's deposition was scheduled in the FTC case.

According to Moore's deposition, Copilevitz did not tell Moore that day that she should do anything she could to keep all of his emails. He knew but did not tell her that there was pending an FTC case against Pasch and Keezer. He knew but failed to mention that the government had demanded the production of emails relevant to the issue. He didn't tell her of the request of Lowenstein for the production of his file and that he in turn was to turn it over to the government. He did not tell Jill Moore before she wiped away the data that Lowenstein Sandler was intending for him to testify as to how the PMC Model complied with the FTC Order. He said nothing of

the fact that his deposition was scheduled for the next month and that he might need his emails to be able to testify truthfully.

Copilevitz did not tell Jill Moore that there was a litigation hold in place that required him to preserve his client file and he never told her that Missouri law required the firm to "store securely" the client's file for 10 years after the representation had ended.

Copilevitz has claimed in this case that plaintiffs should have known in 2007 that they had a claim for legal malpractice against him (See defendants' choice of law motion). Obviously, if they should have known, the Copilevitz, a lawyer, should have known, as well.

The destruction of the email in 2009 was 2 years after Copilevitz knew that his clients had a legal malpractice claim against him.

Copilevitz never said to Moore that she should do whatever she could to retrieve the data on the hard drive because to do otherwise would be an act of spoliation.

       B.     Plaintiff intends to prove the following contested facts with regard to damages: (This must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages).

Defendants argue that the money Plaintiffs put into CDG to build out the PMC Model was not a loan. Plaintiffs put money in based on Copilevitz's incorrect legal advice. The form of the money transfer is irrelevant. **$10,619,950.**

Plaintiffs paid penalties to the FTC of $6.8 and $6.3 million dollars. **$13,100,000.** We believe this is an admitted fact.

Defendant contends that Plaintiffs may not recover legal fees paid to Lowenstein Sandler in that that none of the legal fees were paid personally by Scott Pasch (J Henry Scott) or David Keezer but rather by CDG. Plaintiffs will prove that according to the Lowenstein Sandler accounting department $292,328.19 was paid personally by Scott Pasch (J Henry Scott) and $277,328.18 was paid personally by David Keezer. These are damages personal to the Plaintiffs. **$569,656.37.**

5.     **DEFENDANT'S CONTESTED FACTS** (State separately for each defendant. See instructions above).

    A.    Defendant intends to prove the following contested facts with regard to liability.

1. There are numerous valid ways to use a consulting model. From a regulatory compliance perspective, the concept of the "consulting model" was lawfully designed to address the impact of state and federal Do Not Call laws which greatly impacted the ability of solicitors to contact consumers by phone. As they developed, state and federal do not call laws provide that businesses that acted as outside telemarketers to charities were subject to the Do Not Call requirements, whereas charities themselves were not subject to such restrictions. As the charities would be able to contact consumers whose names may appear on the Do Not Call registries, as opposed to outside call centers that could not make such calls, this was a bona fide legal strategy.

2. The key to the lawful implementation and use defense of a consulting model is that the parties' conduct must be consistent with their represented roles. If a party is to act as a consultant, his role should be limited to providing advice, and not controlling the consumer communications and the charitable solicitation process.

3. CDG in numerous instances failed to properly conduct itself as a consultant.

4. Because CDG's actions in controlling the solicitation process, CDG's change from a professional fundraiser to a consultant was in some cases viewed as "form over substance" by some state regulators. CDG presented the consulting model to its clients as nothing more than a new label for the same relationship. Despite supposedly transitioning all call center operations to the charities, CDG advised them that "[n]othing major will change as far as what you do on a day-to-day basis."

5. CDG was well aware of its failures to adhere to a true consultant based on the feedback received from regulators, including the states of Indiana in 2005 and Connecticut in 2006. Regulators told Mr. Copilevitz (and CDG) that they did not see any meaningful difference in the operations of the fundraising process in the solicitor model versus the consulting model. Mr. Copilevitz relayed this information to Plaintiffs in a series of communications in which he advised Plaintiffs as to restructuring their roles to reduce legal risk.

6. Mr. Copilevitz advised CDG of the importance of the charities being the bona fide employers with control over the operations and its employees. At her deposition, CDG's CFO Alyce Cucurullo acknowledged that CDG knew of the importance of the charity controlling the solicitation operations.

7. In January 2006, Mr. Copilevitz met with regulators in the State of Connecticut. Like the Indiana regulators, Connecticut raised concerns that the telemarketers were not "bona fide employees" of the charity and saw "this arrangement as CDG still controlling the telemarketers, even though the callers may be on the payroll of the" charity. Mr. Copilevitz promptly and correctly shared these concerns with Mr. Pasch

and Ms. Cucurullo in a memo dated January 31, 2006. Rather than change CDG's structure, Ms. Cucurullo responded to Mr. Copilevitz with "some ammunition" to support the bona fide employee argument, confirming that CDG was well aware of the regulators' concern regarding CDG's continuing control of the fundraising process as a consultant, and made a conscious decision to nonetheless proceed along the same path.

8. The underlying records reflect that CDG in numerous instances disregarded Mr. Copilevitz's advice regarding the implementation of the consulting model and the feedback received from the state regulators as to the need to better demonstrate that the charities were in control of the fundraising operations. While the revised consulting contracts sought to delegate control to the charities, there is significant evidence that Plaintiffs continued to control the fundraising process. In actuality, the charity was more of a "fundraiser by proxy," a risk which Mr. Copilevitz had clearly identified.

9. For example, the Disabled Veterans Association objected to CDG using fundraising pieces that it claimed it never approved. Communications between Mr. Pasch and Ms. Seman from the charity make it appear that CDG is the party in control and that the charity is merely a front for CDG's operations. This is inconsistent with a consulting relationship. When confronted with the Seman materials during the Department of Justice (DOJ) litigation, Mr. Pasch admitted to his attorneys "I knew this one was out there.... This is not good."

10. The record reflects that Mr. Pasch, in particular, had his mind made up that the consulting model would be the "future" of the industry, and would make more money for the Plaintiffs. He pushed forward even in the face of concerns raised by his CFO, Alyce Cucurullo. Mr. Pasch instructed Mr. Copilevitz as to how he wanted the model to be structured, and he and Ms. Cucurullo both encouraged Mr. Copilevitz to advocate to sell its approval of the CDG consulting model by state regulators. In sum, the evidence shows that CDG received cautionary advice from Mr. Copilevitz and made a conscious decision not to heed his advice.

11. The change from fundraising to consulting did not constitute a change in compliance obligations.

12. In certain circumstances, there is a benefit in seeking an advisory opinion. Indeed, under different circumstances, Copilevitz & Canter has sought FTC advisory opinions to seek clarifications on inconsistencies in certain aspects of the TSR. However, those instances are limited and would not be applicable to the underlying practices at issue in the 2007 FTC or DOJ lawsuit.

13. An advisory opinion under § 2.41(d)(1) is not even available "where the course of action is already being followed by the requesting party." My review of the record shows that CDG's intention was to first test the consulting model in Indiana and perhaps one or two other states in 2003 and 2004, to get feedback from regulators, and to then reassess the model. The Plaintiffs apparently changed their minds, and pushed forward with many other clients, before receiving that feedback, or in spite of

the feedback they did receive. Under these circumstances, the FTC would decline to issue an advisory opinion under section 2.41(d)(1).

14. To the extent the Plaintiffs possibly could have sought an advisory opinion prior to any testing of the model in Indiana, it is unclear what would have been presented to the FTC, or how, and what FTC advice would have been sought. CDG's CFO, Ms. Cucurullo, understandably did not have any answer to this question in her deposition testimony.

15. As of January 2005, Plaintiffs received feedback from state regulators who stated that the change to the consulting model was "form over substance". Notwithstanding being told of these concerns, Plaintiffs continued with the consulting model in which they retained control over the fundraising operations.

16. Plaintiffs did not adhere to any consulting arrangement which might have been provided to the FTC for any favorable putative FTC advisory opinion. An FTC advisory opinion will only address the specific compliance question presented. The contracts and model discussed in 2003 (prior to launch) were different than the model initially utilized in 2004, and differed further from many other versions utilized in later years. Moreover, CDG in 2009 acknowledged that there was no standard consulting model as "the precise scope of consulting services provided by CDG varied based on the individual needs of each client."

17. An important predicate of any FTC advisory opinion would be that the "opinion applies only to the extent that actual company practices conform to the material submitted for review." Such a limitation was contained in FTC advisory opinions relating to telemarketing issued in the 2004 time frame, including an FTC Advisory Opinion issued to Attorney William Raney at Copilevitz & Canter on January 6, 2004. To the extent the consulting model was not practiced in a manner that actually ceded operations and control to the charities, any FTC opinion predicated on those representations would be worthless.

18. A key component in an Advisory Opinion is that any promotional activity must be truthful, non-deceptive and non-misleading.

19. The parties under this 1998 Consent Order were subject to the same standards applicable to <u>any</u> <u>vendor</u> under the Telemarketing Sales Rule as amended ("TSR"). Under Paragraph VIII of the 1998 Consent Order, Plaintiffs were prohibited from providing the means and instrumentalities, or otherwise assisting and facilitating any person who they knew or should have known was making false or misleading representations about the purpose for which charitable contributions have been or will be used, the geographic location of the charity, organization or program that has benefitted or will benefit from charitable contributions or any fact material to any person to make any charitable contribution.

20. Whether or not Plaintiffs were subject to the 1998 Consent Order, they were at all times subject to the same essential prohibitions as any party at large. Section 310.3(b) of the Telemarketing Sales Rule applied to Plaintiffs whether or not the 1998 Consent Order existed. That Rule specifically provides that "[i]t is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows

or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§310.3(a), (c) or (d), or §310.4" of the Telemarketing Sales Rule (the "TSR"). The cited sections include prohibitions on deceptive or abusive telemarketing acts or practices, including acts or practices in the solicitation of charitable contributions. Those are always prohibited and unlawful with or without the 1998 Consent Order.

21. Notwithstanding the fact that persons who supply services to telemarketers are subject to potential liability for the acts of their telemarketing clients, a wide array of legitimate businesses provide such services lawfully without being subject to liability. Such vendors include list brokers who supply leads to be contacted, payment processors who process transactions, fulfillment providers, caging facilities that process donations or orders, and many others, all subject to potential liability if they fail to meet their obligation to reasonably confirm that the parties to whom they are providing their products and services are in reasonable compliance with the TSR.

22. While such vendors are not guarantors that telemarketers are complying with the TSR, the TSR requires that the vendor exercise due diligence to reasonably confirm that their clients are in compliance. Thus, it is prudent that any business that provides substantial services to telemarketers take steps, i.e., due diligence, to discern whether their clients are in compliance with the TSR and that the telemarketers are not making material misrepresentations or omissions. This is an inherent obligation of due diligence.

23. If a telemarketing consultant's due diligence efforts are performed properly, a telemarketing consultant can lessen or decrease the risk of its regulatory enforcement compared to what it would have as a telemarketing fundraiser. A telemarketing fundraiser is generally held to a strict liability standard for violations of the TSR or Section 5 of the FTC Act. However, a true consultant is subject to a much more lenient standard of "knows or consciously avoids knowing" that the charity is violating the TSR. Here, Plaintiffs were subject to a "knows or consciously avoids knowing" standard under the TSR, and a "knew or should have known" standard under the 1998 Consent Order. Both standards require diligence in practice by the professional consultant vendor. Had it been properly implemented by CDG, its regulatory exposure (and that of Mr. Pasch and Mr. Keezer) would have been reduced. For these reasons, the described "liability conundrum" espoused by Professor Richards is not accurate and does not apply here.

24. Notwithstanding the lesser potential liability risk for a diligent consultant, the Government alleged that the misrepresentations were those of CDG and were of a type that CDG controlled. For example, in charging that millions of calls contained material misrepresentations, the government (the Department of Justice) contended that CDG created, revised, and maintained the scripts that callers used to solicit funds. The government further contended that the charities had little control over fundraising. Those facts were visible as to Mr. Pasch in his dispute with Ms. Pam Seman and the (Ohio) Disabled Veterans Association. The DOJ had that damaging Ohio evidence.

25. The gravamen of the 2007 FTC action concerned CDG and its principals violation of the 1998 Consent Order and the TSR for misrepresentations to consumers or liability for assisting such misrepresentations when CDG consulting clients did fundraising on behalf of Charity or NFP organizations.

26. When the FTC files an enforcement action, it issues a press release outlining the key assertions in its case. Here, the September 27, 2007 press release headline was "FTC Charges New Jersey Telephone Fund-Raisers with Misleading Consumers Nationwide About How Charitable Donations Will be Used" The press release began with the following:

> i. The Federal Trade Commission today announced a complaint seeking civil penalties against a New Jersey-based telemarketer that allegedly made misrepresentations to consumers when fund-raising for police, firefighter, and other non-profit organizations, in violation of a 1998 stipulated order and the Commission's Telemarketing Sales Rule (TSR).

> ii. According to the FTC, although the stipulated order and the TSR bar the defendants from making any misrepresentation that would be material to a consumers' decision whether to make a charitable donation, the defendants mislead consumers by telling them that defendants' telemarketers work directly for the charities for which they are calling, that consumers' donations would be paid to the charities, and that "100%" of the consumers' donations would go to the charity.

> iii. Counts I, II, IV and V of the 2007 complaint alleged that the CDG parties made material misrepresentations to consumers about the purpose of the donations. Count III of the 2007 complaint alleged that CDG parties assisted charities in making the same misrepresentations. The remaining counts charged the CDG parties with failure to comply with technical aspects of the TSR, such as transmittal of caller ID information and failure to discontinue calls when requested.

27. This press release does not even refer to CDG as a consultant, which had no relationship to the charged CDG's misrepresentations.

28. The FTC's post-settlement press release in 2010 similarly focused on CDG's liability for misrepresentations. The March 31, 2010 press release headline was "Defendants Deceived Consumers into Believing All Donations Would Help Local Police, Firefighters, Veterans." The press release explained the FTC's concerns that CDG

mislead consumers to think that they were donating directly to legitimate charities serving police, firefighters, and veterans, when in fact only a small percentage of the donation went directly to the charitable purposes.

29. There were two key misrepresentations that the FTC focused on in the lawsuit: 1) that callers were identifying themselves as employees of the charities, when in fact they were employees of CDG; and 2) that callers were telling potential donors that "100%" of their donation would go to the charities, when that was not true.

30. Although the Plaintiffs allege that Mr. Copilevitz advised that it would be acceptable for callers to tell donors that 100% of their donation would go to the charities, without any qualifying language, I have seen nothing to substantiate the Plaintiffs' claim. CDG moved the language out of the Q&A section and to the upfront portion of scripts -- without any qualifying language -- at the request of the Connecticut FOP, and without consulting Mr. Copilevitz or his firm. This was done in February of 2007, and just a few months later (July 2007), CDG was advised by the FTC that it was under investigation.

31. The Defendants did not advise Plaintiffs or CDG to move the 100% language to the upfront portion of the scripts.

 

 

           B.     Defendant intends to prove the following contested facts with regard to

damages. (This statement must include the factual basis for each defense against plaintiff's

claims for damages).

        1.     Defendants' contested damage issues are outlined in its motion in limine.

 

 

        6.    **PLAINTIFF'S WITNESSES** (Aside from those called for impeachment

purposes, only those witnesses whose names and addresses are listed below will be permitted

to testify at trial).

           A.     On liability, plaintiff intends to call the following witnesses

who will testify in accordance with the following summaries:

        **David Keezer**
Mr. Keezer will testify as to the formation of CDG, his work at CDG, his dealings with Errol Copilevitz and others at Copilevitz & Canter, the advice rendered by Mr. Copilevitz with regard to the PMC Model, the 1998 FTC

Consent Order, the litigation with the FTC, the representation of CDG by Lowenstein Sandler, the settlement with the FTC and all other topics covered by his deposition and discovery relevant to this legal malpractice case.

**Scott Pasch a/k/a J Henry Scott**
Mr. Keezer will testify as to the formation of CDG, his work at CDG, his dealings with Errol Copilevitz and others at Copilevitz & Canter, the advice rendered by Mr. Copilevitz with regard to the PMC Model, the 1998 FTC Consent Order, the litigation with the FTC, the representation of CDG by Lowenstein Sandler, the settlement with the FTC and all other topics covered by his depositions in this case and the underlying FTC case and discovery relevant to this legal malpractice case.

**Matthew Oliver, Esq. of Lowenstein Sandler**
Mr. Oliver will testify as to Lowenstein Sandler's representation of Keezer and Scott in the FTC litigation, his dealings with Errol Copilevitz and others at Copilevitz & Canter including, but not limited to, the advice of counsel defense, the settlement with the FTC and other topics covered by his depositions in this case and the underlying FTC case and discovery relevant to this legal malpractice case.

**Carl Greenfeld formerly of Lowenstein Sandler**
Greenfield will testify as to his legal work in the defense of CDG in the 2007 FTC case.

*[handwritten left margin:]* Defendants object on relevance grounds to be addressed in trial Brief

**Alyce Cucurullo**
Ms. Cucurullo will testify as to her work for CDG, her dealings with David Keezer, Scott Pasch, Errol Copilevitz and others at Copilevitz & Canter, the advice rendered by Mr. Copilevitz with regard to the PMC Model, the 1998 FTC Consent Order, the litigation with the FTC, the representation of CDG by Lowenstein Sandler, the settlement with the FTC and all other topics covered by her depositions in this case and the underlying FTC case and discovery relevant to this legal malpractice case.

**Sharon Latini**
Ms Latini was a lawyer at CDG from 1998 to 2007. Ms. Latani will testify consistent with her deposition taken in this case.

**Jawana Hardwyck**
Ms. Hardwyck was an employee in the Compliance Department at CDG. She will testify consistent with her deposition.

**Errol Copilevitz**
Mr. Copilevitz will testify as to his representation of CDG, Keezer and Pasch in the 1998 FTC case resulting in the Consent Order, his representation with regard to all State inquiries and litigation, his representation with regard to the implementation of the PMC Model and the FTC litigation that followed, all advice given to CDG, Keezer and Pasch with regard to the PMC Model, his

work with Lowenstein Sandler after they took over representation in the FTC litigation, the "advice of counsel" defense to the FTC litigation, his computer "crash" and all other topics covered by his deposition in this litigation.

**Gregory Lam**
Mr. Lam will testify as to his representation of CDG, Keezer and Pasch in the FTC litigation and all other topics covered by his deposition in this litigation.

**William Raney**
Mr. Raney will testify as to his knowledge of Errol Copilevitz's computer crash and other topics covered by his deposition in this litigation.

*[handwritten: Subject of in limine Motion]*

**Jill Moore**
Ms. Moore will testify as to Errol Copilevitz's decision to tell Ms. Moore to wipe the hard drive of his personal computer, which contained the only digital copy of his emails. Ms. Moore will testify consistent with her deposition and discovery on that issue in this legal malpractice case.

B.     On damages, plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:

**David Keezer**
Mr. Keezer will testify as to the amount of the Judgment assessed by the FTC against him personally, the sale of his personal assets required to satisfy the Judgment and as to the payment of legal fees to Lowenstein Sandler by himself personally.

**Scott Pasch a/k/a J Henry Scott**
Mr. Scott will testify as to the amount of the Judgment assessed by the FTC against him personally, the sale of his personal assets required to satisfy the Judgment and as to the payment of legal fees to Lowenstein Sandler by himself personally.

*[handwritten: Defendants Object on relevance grounds to be addressed in Trial Brief]*

**Matthew Oliver, Esq. of Lowenstein Sandler**
Mr. Oliver will testify as to the amount of legal fees paid personally by David Keezer and Scott Pasch a/k/a J Henry Scott and as to the reasonableness and necessity of those legal fees and as to how the settlement was achieved.

C.     Defendant objects to the following witnesses for the reasons stated:

Plaintiffs and Defendants are working through their objections, will have them finalized no later than the pre-trial conference, and will supplement this pre-trial order accordingly. *[handwritten: See above]*

29

7.    **DEFENDANT'S WITNESSES** (See instructions above).

    A.    On liability, defendant intends to call the following witnesses who will

testify in accordance with the following summaries:

1.

**Scott Pasch a/k/a J. Henry Scott**
**c/o Glenn Bergenfield, Esq.**

It is anticipated that Mr. Pasch will testify to the formation and background of CDG; CDG's compliance with the Consent Order; the inception of the consulting model; CDG's compliance with state fundraising laws; and consulting operations.

2.

**David Keezer**
**c/o Glenn Bergenfield, Esq.**

It is anticipated that Mr. Keezer will testify to the formation and background of CDG; CDG's compliance with the Consent Order; the consulting model; and CDG's compliance with state fundraising laws.

3.

**Alyce Cucurullo**
6 Wertsville Road
Hillsboro, NJ 08844

It is anticipated that Ms. Cucurullo will testify to CDG's compliance with the Consent Order; the inception of the consulting model; CDG's compliance with state fundraising laws; and consulting operations.

4.

**Lee Ostrowsky**
20 Alexander Drive
Red Bank, NJ 07701-5529

It is anticipated that Mr. Ostrowsky will testify to the inception of the consulting model; communications with clients concerning the consulting model; and consulting operations.

5.

**Richard Whelan**
15 Ridgeway Drive
Bordentown, NJ 08505-4269

It is anticipated that Mr. Whelan will testify to the inception of the consulting model; communications with clients concerning the consulting model; and consulting operations.

6.

**Lee Tager**
52 Canton Road
West Simsbury, CT

It is anticipated that Mr. Tager will testify to the operations of the Connecticut Fraternal Order of Police call center.

7.

**Jawana Hardwick**
1181 Main St. – Apt. 8K
Rahway, NJ 08869-0005

It is anticipated that Ms. Hardwick will testify to CDG's compliance with the Consent Order; CDG's compliance with state and federal fundraising statutes; and consulting operations,

8.

**Timothy Downs**
5310 E. Wayside Court
Monticello, IN 47960-7352

It is anticipated that Mr. Downs will testify to the inception of the consulting model; communications with state regulatory authorities concerning the consulting model; communications with CDG concerning the consulting model; and consulting operations.

9.

**Jeffrey S. Elefant**
7 Darien Ct.
Trenton, NJ 08620-1005

It is anticipated that Mr. Elefant will testify to the accounting and back office consulting services CDG provided to its clients; CDG's compliance with the Consent Order; CDG's compliance with state and federal fundraising laws; and consulting operations.

10.

**Sharon M. Latini**
748 Jackson Road
Stewartsville, NJ 08886-2644

It is anticipated that Ms. Latini will testify to the accounting and back office consulting services CDG provided to its clients; CDG's compliance with the Consent Order; CDG's compliance with state and federal fundraising laws; and consulting operations.

11.

**Errol Copilevitz**
c/o Paul Boylan, Esq.

Mr. Copilevitz will testify about advice given to CDG regarding consulting.

12.

**Gregory Lam**
c/o Matthew Marrone, Esq.

Mr. Lam will testify about the firm and advice given to CDG.

13.

**William Raney**
c/o Matthew Marrone, Esq.

Mr. Raney will testify about the firm and advice given to CDG.

14.

**Jill Moore**
c/o Matthew Marrone, Esq.

Jill Moore will testify about IT, if needed.

15.

**Glenn Pasch**
446 Route 35 South,
Building C
Eatontown, NJ 07724

It is anticipated that Mr. Pasch will testify to consulting operations.

16.

**Pamela Weber**
6848 Reid Drive
Parma Heights, OH  44130

Ms. Weber will testify regarding CDG's proposal of the consulting model to the Disabled
Veterans Associations ("DVA") and the consulting model contract the DVA entered into
with CDG.  Ms. Weber will also testify regarding the transition to the consulting model,
consulting model fundraising operations, and consulting model money flows and expense
payments.  Ms. Weber will testify regarding scripts used for her organization and her
dealings and communications with CDG.

17.

**Leo Blackwell, Esq.**
Ruckelshaus Kautzman Blackwell Bemis & Hasbrook
107 N. Pennsylvania St., Suite 900
Indianapolis, IN 46204

It is anticipated that Mr. Blackwell will testify to the inception of the consulting model and
communications with state regulatory authorities concerning the consulting model.

18.

**Frank D. Stephens**
Manager with Fireco, LLC
2095 Old Hillsboro Road, Franklin, TN 37064

Mr. Stephens will testify about his company's use of a consulting model.


(Defendants reserve the right to call any witnesses listed in Plaintiffs' list.)

B.    On damages, defendant intends to call the following witnesses who

will testify in accordance with the following summaries:

Joseph Lesovitz

C.    Plaintiff objects to the following witnesses for the reasons stated:

Plaintiffs and Defendants are working through their objections, will have them

finalized no later than the pre-trial conference, and will supplement this pre-trial order

accordingly.

*NONE OTHER THAN THOSE WHICH ARE SUBJECT OF IN LIMINE MOTIONS*

8.   **EXPERT WITNESSES** (No opposing counsel shall be permitted to question the expert's qualifications unless the basis of an objection is set forth herein).

    A.   Plaintiff's expert witnesses are:

        **Lewis H. Goldfarb, Esq.**
        McElroy, Deutsch, Mulvaney & Carpenter, LLP
        1300 Mt. Kemble Avenue
        Post Office Box 2075
        Morristown, New Jersey 07962

        **Neil M. Richards, Esq.**
        7070 Lindell Boulevard
        Saint Louis, Missouri 63130

    B.   Defendant's objections to the qualifications of plaintiff's experts and their opinions are set forth in their motions in limine.

    C.   Defendant's expert witnesses are:

       1.   Andrew Lustigman, Esquire

       2.   Joseph Lesovitz, CPA

    D.   Plaintiff's do not object to the qualifications of defendant's experts; our objection to certain of their opinions are set forth in our motions in limine.

9.   **PLAINTIFF'S EXHIBITS** (Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made).

    A.   Plaintiff intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):

B.     Defendant objects to the introduction of plaintiff's exhibits (set forth number of an exhibit and grounds for objection):

Plaintiffs and Defendants are working through their objections, will have them finalized no later than the pre-trial conference, and will supplement this pre-trial order accordingly.

10.     **DEFENDANT'S EXHIBITS**

A.     Defendant intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):

B.     Plaintiff objects to the introduction of defendant's exhibits (set forth number of exhibit and grounds for objection):

Plaintiffs and Defendants are working through their objections, will have them finalized no later than the pre-trial conference, and will supplement this pre-trial order accordingly.

(Copies of exhibits are to be made for opposing counsel, and a bench book of exhibits is to be delivered to the Judge at the start of trial. If counsel desires to display exhibits to the jury, sufficient copies should be available to provide each juror with a copy; alternatively, enlarged photographic or projected copies may be used).

11.     **PLAINTIFF'S LEGAL ISSUES**

A.     Did the defendant give legal advice inconsistent with the standard of care, which advice was a substantial proximate cause of damages to the plaintiffs?

B.     Is *in pari delicto* a defense in this case?

C.     The defendants have violated the instruction of the Court by failing to identify and provide to us which of the 40 state investigations they believe are admissible.

12. **DEFENDANT'S LEGAL ISSUES**

A. The legal advice by defendants as to the consulting model was not a deviation from the applicable standard of care.

B. Not seeking an advisory opinion from the FTC was not a deviation from the standard of care

C. Counseling a client subject to an existing FTC consent order to provide consulting services which "assist or facilitate" telemarketing activities is not substandard advice.

D. The 2007 DOJ action alleged, and was premised on misrepresentations to consumers.

E. The decision by Pasch and Keezer to settle the DOJ lawsuit was not caused by any legal advice of defendants but was a business decision predicated on a number of unrelated factors.

F. Defendants were not negligent.

G. Defendants did not cause Plaintiffs' damages.

H. Plaintiffs' claims are barred due to the doctrine of *in pari delicto*.

13. **CHOICE OF LAW:** (If there is any issue as to what state's law is applicable to any count of the complaint, set forth the choice of law question. This issue shall be separately briefed in accordance with an order to be entered herewith).

Defendants assert Missouri law applies. This Court has already ruled that New Jersey law applies.

14. **MISCELLANEOUS** (Set forth any other matters which require action by, or should be brought to the attention of the Court).

36

15. **JURY TRIALS** *By 9/15/17 unless otherwise directed by Court*

    A.    Each side shall submit to the Judge and to opposing counsel a trial brief memorandum in accordance with Local Civil Rule 7.2B, with citations to authorities and arguments in support of its position on all disputed issues of law. In the event the brief shall not be filed, the delinquent party's complaint or defense may be stricken.

    B.    Counsel for each party shall submit to the Judge, with a copy to opposing counsel.

    C.    Written requests for instructions to the jury. Supplemental requests for instructions may be submitted at any time prior to argument to the jury. All requests for instructions shall be plainly marked with the name and number of the case, shall contain citations of supporting authorities, if any, and shall designate the party submitting same. In the case of multiple requests by a party, these shall be numbered in sequence and each request shall be on a separate sheet of paper.

    C.    Joint proposed verdict form/special interrogatories are to be submitted to the trial judge.

    D.    Proposed voir dire are to be submitted to the trial judge.

16. **NON-JURY TRIALS** - not later than

    A.    Each side shall submit to the Judge and opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2B with citation to authorities and arguments in support of its position on all disputed issues of law. In the event a brief shall not be filed, the delinquent party's complaint or defense may be stricken.

    B.    Each side shall submit to the Judge and other counsel proposed written findings of fact and conclusions of law. There is reserved to counsel the right to submit additional proposed findings of fact and conclusions of law during the course of the trial on those matters that cannot reasonably be anticipated.

17. **TRIAL COUNSEL** (List the names of trial counsel for all parties).

Glenn Bergenfield, Esq. – Plaintiffs

Paul Boylan, Esq. – Errol Copilevitz, Esq.

Matthew Marrone, Esq. – Copilevitz & Canter

18.　**BIFURCATION** (Where appropriate, the issues relating to liability shall be severed and tried to verdict. Thereafter, all issues relating to damages will be tried).

The issues of liability and damages SHALL / SHALL NOT be tried separately.

19.　**ESTIMATED LENGTH OF TRIAL**

DAYS FOR LIABILITY

and　*15 days total*

DAYS FOR DAMAGES.

The parties will discuss this at the final pre-trial conference.

AMENDMENTS TO THIS PRETRIAL ORDER WILL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED.

_____

_____

_____
(ATTORNEY FOR PLAINTIFF)

_____
(ATTORNEY FOR DEFENDANT)

_____
UNITED STATES MAGISTRATE JUDGE

DATED: _Sept 5, 2017_

(EXHIBIT LIST TO FOLLOW)

39

# KEEZER AND PASCH V. ERROL COPILEVITZ, AND COPILEVITZ & CANTER
## PLAINTIFFS TRIAL EXHIBITS

| | | |
|---|---|---|
| P1 | 06/08/96 | FTC Compliance Memo |
| P2 | 05/12/98 | Letter from Errol Copilevitz to Scott Pasch, David Keezer and Eric Greenberg |
| P3 | 05/21/98 | Letter from Errol Copilevitz to FTC |
| P4 | 06/15/98 | Letter from Errol Copilevitz to Joseph Koman |
| P5 | 07/08/98 | Letters from FTC to David Keezer and Scott Pasch |
| P6 | 07/23/98 | Email from Claribel Cosio to Partners |
| P7 | 07/23/98 | Memo from Errol Copilevitz to Scott Pasch, David Keezer, Kim Gibson, Claribel Cosio and Eric Greenberg |
| P8 | 09/01/98 | Letter from Errol Copilevitz to FTC |
| P9 | 09/24/98 | FTC decision and Order |
| P10 | 10/08/98 | Memo from Errol Copilevitz to David Keezer, Scott Pasch |
| P11 | 10/23/98 | Letter from FTC to Errol Copilevitz |
| P12 | 10/27/98 | Letter from Errol Copilevitz to Scott Pasch and David Keezer |
| P13 | 10/27/98 | Letter from Errol Copilevitz to Joseph Koman |
| P14 | 11/05/98 | Letter from Errol Copilevitz to Joseph Koman |
| P15 | 11/06/98 | Letter from Errol Copilevitz to Joseph Koman |
| P16 | 11/18/98 | Memo from Errol Copilevitz to David Keezer, Scott Pasch and Kim Gibson |
| P17 | 12/02/98 | Letter from Errol Copilevitz to Joseph Koman |
| P18 | 08/07/00 | Memo from Errol Copilevitz to Josephine De Vito and Sharon Rympa |
| P19 | 12/31/00 | Operating Agreement of Financial Processing Services LLC |
| P20 | 07/11/02 | Memo from Errol Copilevitz to Leo Blackwell |
| P21 | 08/14/02 | Memo from Errol Copilevitz to Scott Pasch & Alyce Cucurullo |
| P22 | 10/14/02 | Letter from Errol Copilevitz to Scott Pasch |
| P23 | 10/18/02 | Memo from Errol Copilevitz to Scott Pasch |
| P24 | 01/22/03 | Memo from Errol Copilevitz to Scott Pasch |
| P25 | 03/10/03 | Fax cover from Errol Copilevitz to Scott Pasch |
| P26 | 04/08/03 | Letter from Errol Copilevitz to Senator Dick Sears |
| P27 | 05/09/03 | Email from Scott Pasch to Alyce Cucurullo |
| P28 | 05/13/03 | Letter from Errol Copilevitz to Brenda Batista |
| P29 | 05/19/03 | Letter from Errol Copilevitz to Scott Pasch and David Keezer with attachment |
| P30 | 05/21/03 | Email from Alyce Cucurullo to Errol Copilevitz |
| P31 | 06/03/03 | Copilevitz and Canter Legal Bill |
| P32 | 08/07/03 | Letter from Errol Copilevitz to B. David Horne, Esq. |
| P33 | 12/02/03 | Letter from Errol Copilevitz to Alaska Attorney General |
| P34 | 12/12/03 | Letter from Errol Copilevitz to Alaska Attorney General |

| P35 | 01/06/04 | Advisory Opinion Letter from FTC to William Raney |
| P36 | 01/21/04 | Email from Scott Pasch to Errol Copilevitz |
| P37 | 01/28/04 | Email from Errol Copilevitz to Alyce Cucurullo |
| P38 | 01/28/04 | Letter from Errol Copilevitz to John Ruckelhaus Esq. |
| P39 | 02/02/04 | Memo from Errol Copilevitz to Scott Pasch & Alyce Cucurullo |
| P40 | 02/05/04 | Email from Alyce Cucurullo to Greg Lam |
| P41 | 02/05/04 | Emails between Scott Pasch, Alyce Cucurullo and Errol Copilevitz |
| P42 | 03/26/04 | Letter from Scott Pasch to Todd Collis, NFOP |
| P43 | 09/07/04 | Letter from Errol Copilevitz to Scott Pasch & Alyce Cucurullo |
| P44 | 09/17/04 | Emails between Alyce Cucurullo and Errol Copilevitz |
| P45 | 10/28/04 | Email from Scott Pasch to Alyce Cucurullo |
| P46 | 11/03/04 | Letters from Errol Copilevitz to Alyce Cucurullo |
| P47 | 12/10/04 | Letter from Roger Smith to Kim Gibson |
| P48 | 12/30/04 | Memo from Errol Copilevitz to Alyce Cucurullo & Scott Pasch |
| P49 | 01/10/05 | Email from Alyce Cucurullo to Leo Blackwell and Lee Ostrowsky |
| P50 | 01/10/05 | Memo from Errol Copilevitz to Leo Blackwell & Tim Downs |
| P51 | 01/12/05 | Memo from Errol Copilevitz to Alyce Cucurullo & Scott Pasch |
| P52 | 01/14/05 | Letter from Errol Copilevitz to Roger Smith, Deputy AG, Indiana |
| P53 | 01/18/05 | Memo from Errol Copilevitz to Scott Pasch, David Keezer and Alyce Cucurullo |
| P54 | 01/26/05 | Memo from Errol Copilevitz to Scott Pasch, David Keezer and Alyce Cucurullo |
| P55 | 01/27/05 | Email chain between Alyce Cucurullo, Errol Copilevitz, Scott Pasch and David Keezer |
| P56 | 01/28/05 | Email from Alyce Cucurullo to Errol Copilevitz |
| P57 | 01/28/05 | Memo from Errol Copilevitz to Scott Pasch, David Keezer and Alyce Cucurullo with attachment |
| P58 | 03/03/05 | Memo from Errol Copilevitz to Scott Pasch and David Keezer |
| P59 | 03/03/05 | Email from Errol Copilevitz to Alyce Cucurullo, Scott Pasch and David Keezer |
| P60 | 04/06/05 | Memo from Errol Copilevitz to Scott Pasch, David Keezer and Alyce Cucurullo |
| P61 | 05/09/05 | Memo from Errol Copilevitz to Scott Pasch, David Keezer and Alyce Cucurullo |
| P62 | 01/04/06 | Memo from Errol Copilevitz to Scott Pasch |
| P63 | 01/09/06 | Letter from Errol Copilevitz to Thomas Fiorentino Esq. CT Deputy A.G |
| P64 | 01/09/06 | Letter from Errol Copilevitz to Reid Parrington |
| P65 | 01/18/06 | Memo from Errol Copilevitz to Scott Pasch |

| | | and Alyce Cucurullo |
|---|---|---|
| P66 | 01/31/06 | Memo from Errol Copilevitz to Scott Pasch & Alyce Cucurullo |
| P67 | 01/31/06 | Email from Errol Copilevitz to Alyce Cucurullo & Scott Pasch |
| P68 | 01/31/06 | Email from Alyce Cucurullo to Errol Copilevitz |
| P69 | 02/03/06 | Letter from Errol Copilevitz to Reid Parrington |
| P70 | 02/10/06 | Letter from Errol Copilevitz to Janet Wayne |
| P71 | 02/16/06 | Letter from Errol Copilevitz to Scott Pasch |
| P72 | 05/21/07 | Letter from Errol Copilevitz to Rex Burlinson Esq., Missouri AG, with attached scripts |
| P73 | 07/03/07 | Letter from the FTC to Errol Copilevitz |
| P74 | 07/12/07 | Email from Nathan Thomas to Errol Copilevitz |
| P75 | 07/12/07 | Memo from Nathan Thomas to Errol Copilevitz with attached research |
| P76 | 07/12/07 | Memo from Nathan Thomas to Errol Copilevitz |
| P77 | 07/12/07 | Memo from Errol Copilevitz to Scott Pasch, David Keezer and Alyce Cucurullo |
| P78 | 08/03/07 | Memo from Nathan Thomas to Errol Copilevitz |
| P79 | 08/08/07 | Memo from Errol Copilevitz to Alyce Cucurullo, Scott Pasch, David Keezer |
| P80 | 08/15/07 | Letter from Errol Copilevitz to Mark Josephs, Esq. |
| P81 | 09/05/07 | Letter from Mark Josephs to Errol Copilevitz |
| P82 | 09/07/07 | Letter from Errol Copilevitz to Mark Josephs, Esq. |
| P83 | 09/21/07 | Email from Robert Driscoll to Alyce Cucurullo, Errol Copilevitz, Scott Pasch and Partners |
| P84 | 09/24/07 | USA v CDG LLC Complaint |
| P85 | 10/03/07 | Email from Michael Himmel to Matthew Oliver, Allen Levithan and Carl Greenfeld |
| P86 | 10/31/07 | Email from Errol Copilevitz to Partners, Alyce Cucurullo and Matthew Oliver with attachment |
| P87 | 10/31/07 | Email from Carl Greenfeld to Matthew Oliver |
| P88 | 11/02/07 | Email from Errol Copilevitz to Matthew Oliver, Alyce Cucurullo, Senior Partners and William Raney |
| P89 | 11/07/07 | Email from Errol Copilevitz to Alyce Cucurullo, Scott Pasch, Matthew Oliver and David Keezer |
| P90 | 11/07/07 | Memo from Errol Copilevitz and William Raney to Matthew Oliver, Scott Pasch, David Keezer and Alyce Cucurullo |
| P91 | 11/08/07 | Email from Alyce Cucurullo to Errol Copilevitz |
| P92 | 11/29/07 | Email from Errol Copilevitz to Matthew Oliver, William Raney, Alyce Cucurullo and Senior Partners |
| P93 | 12/07/07 | Letter from Errol Copilevitz to Joel N. Brewer, Esq. |
| P94 | 01/07/08 | Memo from Errol Copilevitz to Carl Greenfeld with attachment |

| P95 | 01/23/08 | Pro Hac Vice Admission of Errol Copilevitz |
|---|---|---|
| P96 | 02/04/08 | Joint Core Discovery Plan in USA v CDG |
| P97 | 07/17/08 | Memo to File |
| P98 | 07/18/08 | Memo from Errol Copilevitz to Matthew Oliver, Scott Pasch, David Keezer and Alyce Cucurullo |
| P99 | 07/23/08 | Memo from Errol Copilevitz and William Raney to Matthew Oliver, Scott Pasch, David Keezer and Alyce Cucurullo |
| P100 | 07/24/08 | Memo from Errol Copilevitz to Matthew Oliver |
| P101 | 08/04/08 | Email from Matthew Oliver to Errol Copilevitz with attachment |
| P102 | 08/05/08 | Memo from Errol Copilevitz to Scott Pasch, David Keezer and Alyce Cucurullo |
| P103 | 09/04/08 | Email from Errol Copilevitz to Matthew Oliver |
| P104 | 09/11/08 | Email from Alyce Cucurullo to Matthew Oliver with attachment |
| P105 | 09/12/08 | Letter from Errol Copilevitz to Matthew Oliver |
| P106 | 09/22/08 | Email from Alyce Cucurullo to Matthew Oliver |
| P107 | 10/02/08 | Email from Matthew Oliver to Errol Copilevitz with attachment |
| P108 | 09/25/08 | Email from Alyce Cucurullo to Matthew Oliver |
| P109 | 04/09/09 | Email from Matthew Oliver to Errol Copilevitz and Janicea51 |
| P110 | 10/07/09 | USA v CDG Notice of Withdrawal of Counsel |
| P111 | 10/13/09 | Email from Matthew Oliver to Michael Himmel, Carl Greenfeld and Jennifer Fiorica |
| P112 | 10/23/09 | Email from Matthew Oliver to Errol Copilevitz |
| P113 | 11/03/09 | Emails between Carl Greenfeld and Matthew Oliver |
| P114 | 01/19/10 | Emails between Alyce Cucurullo and Matthew Oliver |
| P115 | 01/25/10 | Email from Errol Copilevitz to Matthew Oliver |
| P116 | | USA v CDG Summary of Parties In Limine Motions |
| P117 | 01/25/10 | USA v CDG Plaintiff's Trial Brief |
| P118 | 01/25/10 | USA v CDG Defendants' Trial Brief |
| P119 | 03/01/10 | Bankruptcy Petition for Civic Development Group LLC |
| P120 | 03/29/10 | USA v CDG Stipulated Order for Permanent Injunction |
| P121 | 01/13/06 | Email from Reid Parrington to the FTC |
| P122 | 02/21/06 | Email from Reid Parrington to the FTC |
| P123 | | CDG Fundraising Scripts for Indiana FOP |
| P124 | | CDG Fundraising Scripts for Missouri FOP |
| P125 | | CDG Fundraising Scripts for Utah FOP |
| P126 | 09/12/13 | The Center for Investigative Reporting Errol Copilevitz Interview |
| P127 | 03/20/13 | Keezer v Copilevitz - Defendants Answer with Affirmative Defenses |

| P128 | | Keezer v Copilevitz - Defendants Answers to Interrogatories |
| P129 | | Keezer v Copilevitz - Defendants Answers to Plaintiffs Second Notice to Produce |
| P130 | 01/09/15 | Keezer v Copilevitz – Brief in Support of Defendants Motion to Apply Missouri Substantive Law |
| P131 | 01/09/15 | Keezer v Copilevitz – Affidavit of Errol Copilevitz |
| P132 | | Do Not Call Requests |
| P133 | 04/15/08 | Advisory Opinion Letter from the FTC to Kristen Marshall, Copilevitz and Canter LLC |
| P134 | | Management Consulting Agreement |
| P135 | | CDG Management Professional Consulting Services Overview |
| P136 | | Actual Services Performed by CDG Professional Svc Co. |
| P137 | | Professional Management Consulting Model – Start-Up Organization Fact Finding Survey |
| P138 | | Legal Bills of Copilevitz and Canter |
| P139 | | Copilevitz & Canter Website – M. Errol Copilevitz |
| P140 | | USA v CDG Defendants Answers to Interrogatories |
| P141 | | The Copilevitz Telemarketing Fundraising Resource |

# DEFENDANTS' TRIAL EXHIBIT LIST
## Keezer, et al. v. Copilevitz, et al.
## U.S.D.C. (Dist. of NJ) Civil Action – Law, No. 2:13-cv-01191-PGS/TJB
### Index of Materials

1.  Pre Lawsuit Chronology and Case Overview

2.  Complaint – underlying action - (9/24/2007)

3.  Underlying Defendants' Responses & Objections to PL Interrogs.
    First Set - (10/6/2008)

4.  E-Mail: Greenfield to Cucurullo w/ (3) Expert Reports - (4/28/2009):
    (1) Hopkins; (2) Levy w/ CV; and (3) Goldman w/ CV

5.  Gural to Oliver w/ PL Expert Report &*Exhibits – (4/27/2009)
    (1) McAlvanah - (4/27/2009)

6.  Underlying PL Trial Brief - (1/25/2010)

7.  Underlying Defendants' Trial Brief - (1/25/2010)

8.  Stipulated Order for Permanent Injunction & Final Judgment
    re Keezer - (3/29/2010)

9.  Stipulated Order for Permanent Injunction & Final Judgment
    re Pasch, Civic Development Group, LLC & CDG Management, LLC
    (3/29/2010)

10. E-Mails: Oliver, Pasch, Cucurullo & Senior Partners
    ack 5/6/2008 Dep Transcript of R. Peter Byrne

11. Email:  Oliver, Greenfeld & Himmel re knowledge requirement for Aiding &
    Abetting provision of Consent Order - (9/11/2008)

12. Email:  Oliver, Cucurullo & Himmel dated 11/12/08 re FTC Call Summation
    w/attachments of WER and EC Memo to Oliver, Pasch, Keezer & Cucurullo,
    Settlement Conference Statement

13. Emails:  Pasch, Cucurullo, Senior Partners, Oliver re Attorney/Client
    Privilege Waiver dated 12/1/08

14. Emails:  Oliver, Keezer, Pasch, Cucurullo, Senior Partners re Attorney/Client
    Privilege Waiver dated 12/4/08

15. Internal Memo from Joy Eakley to Oliver, Himmel dated 11/24/08 re Assets
    reachable by FTC as Judgment Creditor – US vs. CDG

7302515.1

16. Emails: Cucurullo, Oliver, Himmel dated 10/22/08 re CDG – Summary of Government Production

17. USA vs. CDG – PL's Responses to Defs' Supplemental Interrogatories

18. Emails: Oliver, Errol dated 12/23/08 re activity in case USA vs. CDG

19. Emails: Cucurullo, Oliver dated 12/24/08 re CDG

20. Emails: Pasch, Oliver dated 1/5/09 re FTC trial

21. Emails: Oliver, Cucurullo, Pasch, David Keezer, Himmel, Greenfeld dated 1/7/09 re today's status conference

22. Emails: Pasch, Oliver, Himmel, Greenfeld, Senior Partners, Cucurullo dated 1/27/09 re USA vs. CDG

23. Emails: Thorleifson, Brewer, Parrington, Freeman dated 6/14/06 re Errol's attempt to "restructure" relationship between CDG & CT police group

24. Emails: Cucurullo, Oliver, Himmel, Pasch, Keezer, Greenfeld, Senior Partners, dated from 1/13/09 - 1/30/09 re USA v. CDG

25. Emails: Cucurullo, Oliver, Pasch dated 2/10/09 w/attached FTC Settlement Counter Offer Methodology

26. Emails: Oliver, Cucurullo, Pasch, Keezer dated 2/27/09 re FTC letter re stop reporting

27. Emails: Cucurullo, Oliver, Pasch, Keezer dated 2/26/09 w/attached FTC Counter Settlement Offer Methodology and Settlement Worksheet dated 2/11/09

28. Emails: Oliver, Cucurullo dated 4/8/09 re "a few thoughts"

29. Emails: Pasch, Cucurullo, Senior Partners, Oliver dated 4/13/09 re FTC Settlement Conference

30. Emails: Cucurullo, Oliver dated 4/15/09 re FTC Settlement Summary dated 4/15/09

31. Privileged & Confidential: Summary of 'Talking Points" for 4/17/09 Settlement Conference

32. Emails: Cucurullo, Oliver dated 4/17/09 re fighting & weakening their case

33. Emails: Oliver, Greenfeld, dated 9/17/08 w/attached Opinion Ltr PA from Errol dated 1/3/04 & PMC Opinion Ltr CO from Errol dated 11/3/04

34. Privilege Log of CDG, Pasch & Keezer dated 3/18/13 or USA vs. CDG

35. Emails: Cucurullo, Greg L dated 2/5/04 re Indiana FOP scripts

36. Memo from Errol to Pasch & Cucurullo dated 1/12/05 re Indiana meeting

37. Emails: Cucurullo, Errol, Pasch dated 1/15/15 w/attached INFOP PMC K 1/15/05

38. Memo from Errol to Pasch dated 1/18/05 re Indiana employees

39. Emails: Cucurullo, Pasch, Errol, Keezer dated 1/19/05 re definition of employee

40. Memo from Errol to Pasch dated 1/26/05 re Indiana

41. Emails: Pasch, Errol, Cucurullo, Keezer dated 1/27/05 re Indiana PMC

42. Memo from Errol to Pasch & Cucurullo dated 2/7/05 re State of Indiana – S.B. 424

43. Memo from Errol to Pasch & Keezer dated 3/3/05 re State of Indiana – bona fide employee

44. Memo from Errol to Pasch dated 4/6/05 re Indiana FOP issues

45. Memo from Errol to Pasch & Cucurullo dated 1/31/06 re State of CT

46. Emails: Cucurullo, Errol, Pasch dated 1/31/06 re CT FOP

47. Emails: Pasch, Flynn, Tallberg, Errol dated 2/13/06 re Meeting this Wed with AG

48. Privileged & Confidential: US vs. CDG – Summary Judgment Outline

49. Emails: Oliver, Sherwood, Levithan dated 5/12/09 re follow-up questions re D&O insurance & Chubb

50. Emails: Greenfeld, Oliver dated 5/18/09 re CDG

51. Emails: Oliver, Cucurullo dated 5/18/09 re US vs. CDG – Economic Expert Report

52. Emails: Oliver, Pasch, Strenio dated 5/19/09 re Alert

53. Emails: Strenio, Pasch dated 5/19/09 re Alert

54. Emails: Cucurullo, Oliver dated 5/21/09 re Important Employee Communication

55. Report prepared by David Schweiger for Mark Josephs, USDept of Justice in the Matter of USA vs. CDG, Scott Pasch & David Keezer

56. Emails: Pasch, Cucurullo, Senior Partners, Oliver dated 5/29/09 re CA released their list on Operation False Charity

57. Emails: Oliver, Cucurullo dated 6/1/09 re CA released their list on Operation False Charity

58. Emails: Oliver, Pasch, Cucurullo, Keezer dated 7/7/09 - 7/8/09 re Draft Summary Judgment Brief

59. Emails: Pasch, Oliver dated 7/10/09 re latest draft

60. Emails: Cucurullo, Oliver dated 7/9/09 re EEOC FYI

61. Ltr dated 7/16/09 from Bruce Kagen of US Equal Employment Opportunity Commission to Peter Guattery, Esq. re Ishimaru, et al. vs. CDG

62. Emails: Pasch, Greenfeld, Keezer, Cucurullo, Strenio, Himmel, Oliver, Fiorica dated 7/16/09 re US vs. CDG

63. Emails: Cucurullo, Oliver, Senior Partners dated 9/17/09 re Andy & next steps

64. Emails:  Oliver, Cucurullo, Pasch, Keezer, Greenfeld dated 9/28/09 w/attached DVA documents

65. Emails:  Pasch, Oliver, Greenfeld Pasch, Keezer dated 9/28/09 re DVA documents

66. Emails:  Cucurullo, Oliver dated 9/28/09 re DVA documents

67. Emails:  Cucurullo, Pasch, Oliver, Strenio, Greenfeld, Fiorica, Keezer, Zerwitz dated 9/28/09 re update re settlement

68. Emails:  Cucurullo, Oliver, Strenio, Greenfeld, Pasch, Fiorica, Keezer, Zerwitz dated 9/25/09 – 9/26/09 re update on WARN notice

69. Emails:  Oliver, Cucurullo dated 10/5/09 re pretrial order

70. Emails:  Oliver, Pasch, Cucurullo, Keezer, Strenio, Himmel, Zerwitz, Greenfeld, Fiorica dated 10/12/09 re pretrial conference

71. Emails:  Oliver, Cucurullo dated 10/12/09 re pretrial conference

72. Emails:  Pasch, Oliver, Cucurullo, Keezer, Strenio, Himmel, Zerwitz, Greenfeld, Fiorica dated 10/12/09 re pretrial conference

73. Emails:  Oliver, Cucurullo dated 10/23/09 re Privileged & Confidential

74. Email:  Pasch, Brookreson, Oliver dated 10/26/09 w/attached US vs. CDG message

75. Ltr dated 10/30/09 from Matthew Wilshire to Judge Hochberg re US vs. CDG settlement conference scheduled for 11/9/09

76. Emails:  Oliver, Pasch, Cucurullo, Strenio, Himmel, Zerwitz, Greenfeld, Fiorica dated 11/3/09 re Draft Settlement Conference Statement

77. Emails:  Greenfeld, Oliver dated 11/3/09 re CDG

78. Confidential:  Ltr dated 11/4/09 from Michael Himmel of Lowenstein Sandler to Judge Hochberg - Settlement Conference Statement

79. USA vs. CDG, Pasch & Keezer – Plaintiff's Settlement Conference Statement dated 11/4/09

80. Emails:  Levithan, Pasch, Keezer, Oliver, Sherwood dated 11/4/09 re Privileged & Confidential

81. Privileged & Confidential:  "Talking Points" for 11/9/09 Settlement Conference

82. Emails:  Oliver, Himmel, Strenio, Pasch, Keezer, Cucurullo dated 11/10/09 re settlement conference

83. Emails:  Pasch, Oliver, Cucurullo, Himmel, Strenio, Keezer dated 11/10/09 re settlement conference

84. Emails:  Strenio, Oliver, Cucurullo, Himmel, Pasch, Keezer dated 11/10/09 re settlement conference

85. USA vs. CDG – Order of Judge Hochberg dated 11/17/09

7302515.1

86.     Email:  Oliver, Himmel dated 11/17/09 w/attached US vs. CDG message

87.     Email:  Pasch, Oliver, Keezer, Himmel dated 12/8/09 re Privileged & Confidential

88.     Emails:  Keezer, Pasch, Oliver, Himmel, Zerwitz, Strenio dated 12/9/09 re Update on strategy

89.     Emails:  Strenio, Pasch, Oliver, Himmel, Zerwitz, Keezer dated 12/9/09 - 12/11/09 re update increasing offer

90.     Emails:  Pasch, Levithan, Keezer, Oliver dated 12/11/09 re Statement dated 12/7/09

91.     Emails:  Levithan, Pasch, Keezer, Oliver, Himmel dated 12/15/09 re Statement dated 12/7/09 & Scope of Work

92.     Emails:  Pasch, Cucurullo, Levithan, Oliver, Sherwood, Strenio, Keezer dated 1/3/10 re CDG – Strategy conference call request

93.     Emails:  Oliver, Strenio, Himmel, Greenfeld dated 1/3/10 re update FTC counter offer

94.     Emails:  Pasch, Oliver, Keezer, Levithan, Himmel dated 1/6/10 re Privileged & Confidential – treatment program for serious health issues

95.     Emails:  Levithan, Pasch, Keezer, Himmel, Oliver dated 1/6/10 re Privileged & Confidential – attempt to delay trial

96.     Emails:  Cucurullo, Oliver, Himmel, Levithan dated 1/6/10 - 1/7/10 re Privileged & Confidential – path of company liability

97.     Emails:  Oliver, Blackwell dated 1/14/10 re settlement & trial

98.     Emails:  Pasch, Oliver, Greenfeld, Himmel dated 1/25/10 re tomorrow's settlement conference strategy

99.     Emails:  Pasch, Oliver dated 1/25/10 re Privileged & Confidential – making case on DVA

100.    Emails:  Oliver, Greenfeld, Pasch, Cucurullo, Strenio, Keezer, Himmel, Fiorica, Long, Michael, Lloyd, Zerwitz, Strenio dated 1/25/10 re tomorrow's settlement conference strategy

101.    Emails:  Strenio, Himmel, Oliver dated 1/27/10 re Privileged & Confidential – settlement offer negotiation

102.    Emails:  Strenio, Pasch, Oliver, Himmel dated 1/27/10 re Privileged & Confidential – settlement offer negotiation

103.    Email:  Oliver, Greenfeld, Long, Fiorica, Lloyd, Cross, Himmel, Levithan dated 1/27/10 re CDG – case settled

104.    Email:  Oliver, Errol dated 1/27/10

105.    Emails:  Oliver, Josephs, Buro dated 1/27/10 re USA vs. CDG – conference call

106.    Emails:  Greenfeld, Oliver, Pasch, Strenio, Himmel dated 1/28/10 re settlement certification

107. USA vs. CDG – Certification Agreement dated 1/28/10

108. 7/11/02 EC Memo to Leo Blackwell re: IN FOP

109. May '03 email and AC notes re: MIPOA Consulting Model

110. May '03 MIPOA agreements drafted by EC

111. Jan '04 emails b/w SP and EC re: 1-page amdt

112. 1-31-04 INFOP 1-page contract addendum

113. 2-5-04 emails b/w AC and Lam

114. PMC Overview

115. 3-22-04 Marketing Materials sent to LA by SP

116. 8-24-04 Marketing Materials sent to NY by SP

117. 8-24-04 Marketing Materials sent to NY by LO

118. 8-24-04 Marketing Materials sent to LA by LO

119. 8-24-04 Marketing Materials sent to TN by LO

120. 8-30-04 Marketing Materials sent to CO by LO

121. 8-30-04 Marketing Materials sent to RI by LO

122. 9-13-04 Marketing Materials sent to AL by LO

123. 12-20-04 Marketing Materials sent to PA by LO

124. 12-14-04 Marketing Materials sent to RI by LO

125. PMC PowerPoint Slides

126. 10-28-04 emails b/w AC and SP

127. 1-28-05 emails b/w AC and EC re: INFOP revised agrmt

128. 6-16-05 revised INFOP agrmt

129. Feb '07 exchange w/ Lee Tager re: 100%

130. March '07 UT script w/ 100%

131. 5-15-06 emails JH and AC re: discipline

132. 8-8-06 emails; LO re: discipline

133. 12-29-06 emails; AC and SL re: discipline

134. 3-26-07 emails; LO re: discipline

135. 7-13-05 emails; JH and AC re: discipline

136. 12-27-05 emails; JH & AC re: discipline

137. 7-6-07 emails; AC, SP, DK,EC re: history of PMC

138. 7-31-07 SP email to EC, AC, DK re: 100%

139. Nov '07 script complaints in Arkansas

140. 12-13-07 emails w/ Tager re: 100%

141.   3-17-08 notice of closing Ark.

142.   3/'08 emails b/w SP and Hamby re Ark. probs.

143.   3/'08 AC response to Gov't. request for more info

144.   6-30-08 email of AC to MO and SP/DK re: thoughts

145.   6-17-08 AC Memo to clients

146.   9-25-08 AC email to MO re: dirty laundry

147.   2-16-09 AC Memo to Clients

148.   4-20-09 AC email to MO re: 100% analysis

149.   4-24-09 AC email to MO re: 100% analysis

150.   5-5-09 AC email to MO re: Analysis and "living hell"

151.   7-9-09 AC email to all re: chronology of 100%

152.   PMC Collections by Year

153.   4-20-10 emails b/w AC and EC re: work reference

154.   2-24-11 emails b/w EC and SP re: referral

155.   6-28-11 emails b/w EC and SP re: new investment

156.   12-13-11 emails b/w EC and DK re: Scottsdale

157.   CDG Financial Recap (underlying Ex. D245)

158.   12-31-08 Promissory Note to SP

159.   12-31-08 Promissory Note to DK

160.   Alyce Cucurullo Dep. in FTC case

161.   Pre Lawsuit Chronology

162.   4-30-97 EC letter to SP and DK re: Consent Order

163.   2-12-98 letter of EC to DK & SP forwarding revised Agree & Consent Order

164.   Signed Consent Order

165-167   Keezer $ info

168-170   Pasch $ info

171.   Pam Seman Dep

172.   Plaintiff's responses to Defendants' Requests for Admissions

173.   Plaintiffs' responses to Defendants' Interrogatories in the legal malpractice action

174.   Expert report and CV of Lustigman

175.   Expert report and CV of Lesovitz

176.   Legal Bills invoiced by Copilevitz & Canter, LLC

177.   Website pertaining to Matthew Oliver, Esquire

7302515.1

(https://www.lowenstein.com/moliver/)

178.  September 24, 2007 FTC Press Release as to 2007 FTC Complaint.

179.  March 18, 2009 Cover and page 18 of CDG consolidated and combined financial statements Y/E December 31, 2008 and 2007.

180.  March 31, 2010 FTC Press Release as to settlement of 2007 FTC Complaint.

181.  Underlying motion for summary judgment, and exhibits, by U.S. Gov't.

182.  Underlying motion for summary judgment, and exhibits, by Pasch and Keezer

183.  Underlying final pretrial order

184.  January 2004 emails between Pasch, Alyce, and EC (Plaintiff Dep Ex. P-30)

185.  April 13, 1994; New Jersey; Consent Order

186.  April 30, 1994; Minnesota; Consent Judgment

187.  March 30, 1995; New York; Assurance of Voluntary Compliance

188.  June 22, 1995; Connecticut; Stipulation for Judgment

189.  August 24, 1995; Louisiana; Assurance of Voluntary Compliance

190.  1995; Indiana; Assurance of Voluntary Compliance

191.  March 20, 1996; Massachusetts; Judgment

192.  April 2, 1996; New York; Assurance of Discontinuance (stipulation)

193.  June 4, 1996; Mississippi; Assurance of Voluntary Compliance

194.  October 16, 1996; Louisiana; Assurance of Voluntary Compliance

195.  May 21, 1997; Idaho; Judgment

196.  May 1997; North Carolina; Assurance of Voluntary Compliance

197.  October 30, 1997; New Jersey; Judgment

198.  December 31, 1997; Washington State; Judgment

199.  February 11, 1998; Ohio; Judgment

200.  June 8, 1998; (FTC); Judgment and Consent Order

201.  June 15, 1998; Kansas; Journal Entry Consent Judgment

7302515.1

202. June 25, 1998; Pennsylvania; Assurance of Voluntary Compliance

203. August 10, 1998; Washington State; Stipulated Judgment

204. October 20, 1998; Georgia; Assurance of Voluntary Compliance

205. November 6, 1998; Utah; Assurance of Voluntary Compliance

206. December 10, 1998; South Carolina; Voluntary Consent Agreement (VCA)

207. September 11, 1999; Pennsylvania; Assurance of Voluntary Compliance

208. November 8, 1999; Oklahoma; Assurance of Voluntary Compliance

209. November 29, 1999; Mississippi; Consent Agreement

210. November 29, 1999; New Jersey; Assurance of Voluntary Compliance

211. New Jersey Amended Verified Complaint

212. September 27, 2000; Idaho; Assurance of Voluntary Compliance

213. November 14, 2000; Maine; Consent Decree

214. State of Maine Complaint

215. January 22, 2001; Vermont; Consent Decree

216. Vermont Amended Consumer Fraud Complaint

217. August 6, 2002; Kansas; Journal Entry of Consent Judgment

218. August 12, 2002; Minnesota; Settlement and Consent Judgment

219. February 25, 2003; Mississippi; Sec. State (Admin) – Cease/Desist

220. January 17, 2005; Utah; Assurance of Voluntary Compliance

221. January 5, 2008; Oregon; Assurance of Voluntary Compliance

222. Oregon Notice of Unlawful Practices

223. February 11, 2009; Ohio; Discontinuance

224. State of Ohio Complaint

225. Vermont newspaper article (CC13193-13194)

226. 6/13/03 letter from State of NC to David Keezer (CC15179)

227. 2/26/04 letter from Pasch to Woody Hayes (CC15286)

228. 4/3/03 email from Pasch to Copilevitz (CC15554)

229. 10/17/00 memo from Copilevitz to Pasch (CC12153)

230. 9/13/02 emails (CC14279-14280)

231. Summary of Development – The Indiana Model (CC01016-01017)

232. 11/7/07 memo (CC01521-1531)

233. Professional fundraising consultant registration (CC00669-680)

234. 6/6/07 emails (CC00681)

235. 5/17/07 newspaper article (CC00774-777)

236. 10/12/09 Strenio email

237. 1/23/03 Copilevitz memo

238. CDG and related companies' bankruptcy filings

239. All financial records

240. Pasch and Keezer individual tax returns

241. Demonstrative exhibits

242. All documents designated by Plaintiffs

Defendants request leave to supplement to correct inadvertent omissions or add newly discovered documents.

7302515.1

## KEEZER AND PASCH V. ERROL COPILEVITZ, AND COPILEVITZ & CANTER
### PLAINTIFFS TRIAL EXHIBITS

| | | |
|---|---|---|
| P1 | 06/08/96 | FTC Compliance Memo |
| P2 | 05/12/98 | Letter from Errol Copilevitz to Scott Pasch, David Keezer and Eric Greenberg |
| P3 | 05/21/98 | Letter from Errol Copilevitz to FTC |
| P4 | 06/15/98 | Letter from Errol Copilevitz to Joseph Koman |
| P5 | 07/08/98 | Letters from FTC to David Keezer and Scott Pasch |
| P6 | 07/23/98 | Email from Claribel Cosio to Partners |
| P7 | 07/23/98 | Memo from Errol Copilevitz to Scott Pasch, David Keezer, Kim Gibson, Claribel Cosio and Eric Greenberg |
| P8 | 09/01/98 | Letter from Errol Copilevitz to FTC |
| P9 | 09/24/98 | FTC decision and Order |
| P10 | 10/08/98 | Memo from Errol Copilevitz to David Keezer, Scott Pasch |
| P11 | 10/23/98 | Letter from FTC to Errol Copilevitz |
| P12 | 10/27/98 | Letter from Errol Copilevitz to Scott Pasch and David Keezer |
| P13 | 10/27/98 | Letter from Errol Copilevitz to Joseph Koman |
| P14 | 11/05/98 | Letter from Errol Copilevitz to Joseph Koman |
| P15 | 11/06/98 | Letter from Errol Copilevitz to Joseph Koman |
| P16 | 11/18/98 | Memo from Errol Copilevitz to David Keezer, Scott Pasch and Kim Gibson |
| P17 | 12/02/98 | Letter from Errol Copilevitz to Joseph Koman |
| P18 | 08/07/00 | Memo from Errol Copilevitz to Josephine De Vito and Sharon Rympa |
| P19 | 12/31/00 | Operating Agreement of Financial Processing Services LLC |
| P20 | 07/11/02 | Memo from Errol Copilevitz to Leo Blackwell |
| P21 | 08/14/02 | Memo from Errol Copilevitz to Scott Pasch & Alyce Cucurullo |
| P22 | 10/14/02 | Letter from Errol Copilevitz to Scott Pasch |
| P23 | 10/18/02 | Memo from Errol Copilevitz to Scott Pasch |
| P24 | 01/22/03 | Memo from Errol Copilevitz to Scott Pasch |
| P25 | 03/10/03 | Fax cover from Errol Copilevitz to Scott Pasch |
| P26 | 04/08/03 | Letter from Errol Copilevitz to Senator Dick Sears |
| P27 | 05/09/03 | Email from Scott Pasch to Alyce Cucurullo |
| P28 | 05/13/03 | Letter from Errol Copilevitz to Brenda Batista |
| P29 | 05/19/03 | Letter from Errol Copilevitz to Scott Pasch and David Keezer with attachment |
| P30 | 05/21/03 | Email from Alyce Cucurullo to Errol Copilevitz |
| P31 | 06/03/03 | Copilevitz and Canter Legal Bill |
| P32 | 08/07/03 | Letter from Errol Copilevitz to B. David Horne, Esq. |
| P33 | 12/02/03 | Letter from Errol Copilevitz to Alaska Attorney General |
| P34 | 12/12/03 | Letter from Errol Copilevitz to Alaska Attorney General |

| P35 | 01/06/04 | Advisory Opinion Letter from FTC to William Raney |
|------|----------|----------------------------------------------------|
| P36 | 01/21/04 | Email from Scott Pasch to Errol Copilevitz |
| P37 | 01/28/04 | Email from Errol Copilevitz to Alyce Cucurullo |
| P38 | 01/28/04 | Letter from Errol Copilevitz to John Ruckelhaus Esq. |
| P39 | 02/02/04 | Memo from Errol Copilevitz to Scott Pasch & Alyce Cucurullo |
| P40 | 02/05/04 | Email from Alyce Cucurullo to Greg Lam |
| P41 | 02/05/04 | Emails between Scott Pasch, Alyce Cucurullo and Errol Copilevitz |
| P42 | 03/26/04 | Letter from Scott Pasch to Todd Collis, NFOP |
| P43 | 09/07/04 | Letter from Errol Copilevitz to Scott Pasch & Alyce Cucurullo |
| P44 | 09/17/04 | Emails between Alyce Cucurullo and Errol Copilevitz |
| P45 | 10/28/04 | Email from Scott Pasch to Alyce Cucurullo |
| P46 | 11/03/04 | Letters from Errol Copilevitz to Alyce Cucurullo |
| P47 | 12/10/04 | Letter from Roger Smith to Kim Gibson |
| P48 | 12/30/04 | Memo from Errol Copilevitz to Alyce Cucurullo & Scott Pasch |
| P49 | 01/10/05 | Email from Alyce Cucurullo to Leo Blackwell and Lee Ostrowsky |
| P50 | 01/10/05 | Memo from Errol Copilevitz to Leo Blackwell & Tim Downs |
| P51 | 01/12/05 | Memo from Errol Copilevitz to Alyce Cucurullo & Scott Pasch |
| P52 | 01/14/05 | Letter from Errol Copilevitz to Roger Smith, Deputy AG, Indiana |
| P53 | 01/18/05 | Memo from Errol Copilevitz to Scott Pasch, David Keezer and Alyce Cucurullo |
| P54 | 01/26/05 | Memo from Errol Copilevitz to Scott Pasch, David Keezer and Alyce Cucurullo |
| P55 | 01/27/05 | Email chain between Alyce Cucurullo, Errol Copilevitz, Scott Pasch and David Keezer |
| P56 | 01/28/05 | Email from Alyce Cucurullo to Errol Copilevitz |
| P57 | 01/28/05 | Memo from Errol Copilevitz to Scott Pasch, David Keezer and Alyce Cucurullo with attachment |
| P58 | 03/03/05 | Memo from Errol Copilevitz to Scott Pasch and David Keezer |
| P59 | 03/03/05 | Email from Errol Copilevitz to Alyce Cucurullo, Scott Pasch and David Keezer |
| P60 | 04/06/05 | Memo from Errol Copilevitz to Scott Pasch, David Keezer and Alyce Cucurullo |
| P61 | 05/09/05 | Memo from Errol Copilevitz to Scott Pasch, David Keezer and Alyce Cucurullo |
| P62 | 01/04/06 | Memo from Errol Copilevitz to Scott Pasch |
| P63 | 01/09/06 | Letter from Errol Copilevitz to Thomas Fiorentino Esq. CT Deputy A.G |
| P64 | 01/09/06 | Letter from Errol Copilevitz to Reid Parrington |
| P65 | 01/18/06 | Memo from Errol Copilevitz to Scott Pasch |

| | | and Alyce Cucurullo |
|---|---|---|
| P66 | 01/31/06 | Memo from Errol Copilevitz to Scott Pasch & Alyce Cucurullo |
| P67 | 01/31/06 | Email from Errol Copilevitz to Alyce Cucurullo & Scott Pasch |
| P68 | 01/31/06 | Email from Alyce Cucurullo to Errol Copilevitz |
| P69 | 02/03/06 | Letter from Errol Copilevitz to Reid Parrington |
| P70 | 02/10/06 | Letter from Errol Copilevitz to Janet Wayne |
| P71 | 02/16/06 | Letter from Errol Copilevitz to Scott Pasch |
| P72 | 05/21/07 | Letter from Errol Copilevitz to Rex Burlinson Esq., Missouri AG, with attached scripts |
| P73 | 07/03/07 | Letter from the FTC to Errol Copilevitz |
| P74 | 07/12/07 | Email from Nathan Thomas to Errol Copilevitz |
| P75 | 07/12/07 | Memo from Nathan Thomas to Errol Copilevitz with attached research |
| P76 | 07/12/07 | Memo from Nathan Thomas to Errol Copilevitz |
| P77 | 07/12/07 | Memo from Errol Copilevitz to Scott Pasch, David Keezer and Alyce Cucurullo |
| P78 | 08/03/07 | Memo from Nathan Thomas to Errol Copilevitz |
| P79 | 08/08/07 | Memo from Errol Copilevitz to Alyce Cucurullo, Scott Pasch, David Keezer |
| P80 | 08/15/07 | Letter from Errol Copilevitz to Mark Josephs, Esq. |
| P81 | 09/05/07 | Letter from Mark Josephs to Errol Copilevitz |
| P82 | 09/07/07 | Letter from Errol Copilevitz to Mark Josephs, Esq. |
| P83 | 09/21/07 | Email from Robert Driscoll to Alyce Cucurullo, Errol Copilevitz, Scott Pasch and Partners |
| P84 | 09/24/07 | USA v CDG LLC Complaint |
| P85 | 10/03/07 | Email from Michael Himmel to Matthew Oliver, Allen Levithan and Carl Greenfeld |
| P86 | 10/31/07 | Email from Errol Copilevitz to Partners, Alyce Cucurullo and Matthew Oliver with attachment |
| P87 | 10/31/07 | Email from Carl Greenfeld to Matthew Oliver |
| P88 | 11/02/07 | Email from Errol Copilevitz to Matthew Oliver, Alyce Cucurullo, Senior Partners and William Raney |
| P89 | 11/07/07 | Email from Errol Copilevitz to Alyce Cucurullo, Scott Pasch, Matthew Oliver and David Keezer |
| P90 | 11/07/07 | Memo from Errol Copilevitz and William Raney to Matthew Oliver, Scott Pasch, David Keezer and Alyce Cucurullo |
| P91 | 11/08/07 | Email from Alyce Cucurullo to Errol Copilevitz |
| P92 | 11/29/07 | Email from Errol Copilevitz to Matthew Oliver, William Raney, Alyce Cucurullo and Senior Partners |
| P93 | 12/07/07 | Letter from Errol Copilevitz to Joel N. Brewer, Esq. |
| P94 | 01/07/08 | Memo from Errol Copilevitz to Carl Greenfeld with attachment |

| P95 | 01/23/08 | Pro Hac Vice Admission of Errol Copilevitz |
|---|---|---|
| P96 | 02/04/08 | Joint Core Discovery Plan in USA v CDG |
| P97 | 07/17/08 | Memo to File |
| P98 | 07/18/08 | Memo from Errol Copilevitz to Matthew Oliver, Scott Pasch, David Keezer and Alyce Cucurullo |
| P99 | 07/23/08 | Memo from Errol Copilevitz and William Raney to Matthew Oliver, Scott Pasch, David Keezer and Alyce Cucurullo |
| P100 | 07/24/08 | Memo from Errol Copilevitz to Matthew Oliver |
| P101 | 08/04/08 | Email from Matthew Oliver to Errol Copilevitz with attachment |
| P102 | 08/05/08 | Memo from Errol Copilevitz to Scott Pasch, David Keezer and Alyce Cucurullo |
| P103 | 09/04/08 | Email from Errol Copilevitz to Matthew Oliver |
| P104 | 09/11/08 | Email from Alyce Cucurullo to Matthew Oliver with attachment |
| P105 | 09/12/08 | Letter from Errol Copilevitz to Matthew Oliver |
| P106 | 09/22/08 | Email from Alyce Cucurullo to Matthew Oliver |
| P107 | 10/02/08 | Email from Matthew Oliver to Errol Copilevitz with attachment |
| P108 | 09/25/08 | Email from Alyce Cucurullo to Matthew Oliver |
| P109 | 04/09/09 | Email from Matthew Oliver to Errol Copilevitz and Janicea51 |
| P110 | 10/07/09 | USA v CDG Notice of Withdrawal of Counsel |
| P111 | 10/13/09 | Email from Matthew Oliver to Michael Himmel, Carl Greenfeld and Jennifer Fiorica |
| P112 | 10/23/09 | Email from Matthew Oliver to Errol Copilevitz |
| P113 | 11/03/09 | Emails between Carl Greenfeld and Matthew Oliver |
| P114 | 01/19/10 | Emails between Alyce Cucurullo and Matthew Oliver |
| P115 | 01/25/10 | Email from Errol Copilevitz to Matthew Oliver |
| P116 | | USA v CDG Summary of Parties In Limine Motions |
| P117 | 01/25/10 | USA v CDG Plaintiff's Trial Brief |
| P118 | 01/25/10 | USA v CDG Defendants' Trial Brief |
| P119 | 03/01/10 | Bankruptcy Petition for Civic Development Group LLC |
| P120 | 03/29/10 | USA v CDG Stipulated Order for Permanent Injunction |
| P121 | 01/13/06 | Email from Reid Parrington to the FTC |
| P122 | 02/21/06 | Email from Reid Parrington to the FTC |
| P123 | | CDG Fundraising Scripts for Indiana FOP |
| P124 | | CDG Fundraising Scripts for Missouri FOP |
| P125 | | CDG Fundraising Scripts for Utah FOP |
| P126 | 09/12/13 | The Center for Investigative Reporting Errol Copilevitz Interview |
| P127 | 03/20/13 | Keezer v Copilevitz - Defendants Answer with Affirmative Defenses |

| P128 |          | Keezer v Copilevitz - Defendants Answers to Interrogatories |
|------|----------|-------------------------------------------------------------|
| P129 |          | Keezer v Copilevitz - Defendants Answers to Plaintiffs Second Notice to Produce |
| P130 | 01/09/15 | Keezer v Copilevitz – Brief in Support of Defendants Motion to Apply Missouri Substantive Law |
| P131 | 01/09/15 | Keezer v Copilevitz – Affidavit of Errol Copilevitz |
| P132 |          | Do Not Call Requests |
| P133 | 04/15/08 | Advisory Opinion Letter from the FTC to Kristen Marshall, Copilevitz and Canter LLC |
| P134 |          | Management Consulting Agreement |
| P135 |          | CDG Management Professional Consulting Services Overview |
| P136 |          | Actual Services Performed by CDG Professional Svc Co. |
| P137 |          | Professional Management Consulting Model – Start-Up Organization Fact Finding Survey |
| P138 |          | Legal Bills of Copilevitz and Canter |
| P139 |          | Copilevitz & Canter Website – M. Errol Copilevitz |
| P140 |          | USA v CDG Defendants Answers to Interrogatories |
| P141 |          | The Copilevitz Telemarketing Fundraising Resource |

# DEFENDANTS' TRIAL EXHIBIT LIST
## Keezer, et al. v. Copilevitz, et al.
## U.S.D.C. (Dist. of NJ) Civil Action – Law, No. 2:13-cv-01191-PGS/TJB
### Index of Materials

1. Pre Lawsuit Chronology and Case Overview

2. Complaint – underlying action - (9/24/2007)

3. Underlying Defendants' Responses & Objections to PL Interrogs. First Set - (10/6/2008)

4. E-Mail: Greenfield to Cucurullo w/ (3) Expert Reports - (4/28/2009): (1) Hopkins; (2) Levy w/ CV; and (3) Goldman w/ CV

5. Gural to Oliver w/ PL Expert Report &*Exhibits – (4/27/2009) (1) McAlvanah - (4/27/2009)

6. Underlying PL Trial Brief - (1/25/2010)

7. Underlying Defendants' Trial Brief - (1/25/2010)

8. Stipulated Order for Permanent Injunction & Final Judgment re Keezer - (3/29/2010)

9. Stipulated Order for Permanent Injunction & Final Judgment re Pasch, Civic Development Group, LLC & CDG Management, LLC (3/29/2010)

10. E-Mails: Oliver, Pasch, Cucurullo & Senior Partners ack 5/6/2008 Dep Transcript of R. Peter Byrne

11. Email: Oliver, Greenfeld & Himmel re knowledge requirement for Aiding & Abetting provision of Consent Order - (9/11/2008)

12. Email: Oliver, Cucurullo & Himmel dated 11/12/08 re FTC Call Summation w/attachments of WER and EC Memo to Oliver, Pasch, Keezer & Cucurullo, Settlement Conference Statement

13. Emails: Pasch, Cucurullo, Senior Partners, Oliver re Attorney/Client Privilege Waiver dated 12/1/08

14. Emails: Oliver, Keezer, Pasch, Cucurullo, Senior Partners re Attorney/Client Privilege Waiver dated 12/4/08

15. Internal Memo from Joy Eakley to Oliver, Himmel dated 11/24/08 re Assets reachable by FTC as Judgment Creditor – US vs. CDG

7302515.1

16. Emails: Cucurullo, Oliver, Himmel dated 10/22/08 re CDG – Summary of Government Production

17. USA vs. CDG – PL's Responses to Defs' Supplemental Interrogatories

18. Emails: Oliver, Errol dated 12/23/08 re activity in case USA vs. CDG

19. Emails: Cucurullo, Oliver dated 12/24/08 re CDG

20. Emails: Pasch, Oliver dated 1/5/09 re FTC trial

21. Emails: Oliver, Cucurullo, Pasch, David Keezer, Himmel, Greenfeld dated 1/7/09 re today's status conference

22. Emails: Pasch, Oliver, Himmel, Greenfeld, Senior Partners, Cucurullo dated 1/27/09 re USA vs. CDG

23. Emails: Thorleifson, Brewer, Parrington, Freeman dated 6/14/06 re Errol's attempt to "restructure" relationship between CDG & CT police group

24. Emails: Cucurullo, Oliver, Himmel, Pasch, Keezer, Greenfeld, Senior Partners, dated from 1/13/09 - 1/30/09 re USA v. CDG

25. Emails: Cucurullo, Oliver, Pasch dated 2/10/09 w/attached FTC Settlement Counter Offer Methodology

26. Emails: Oliver, Cucurullo, Pasch, Keezer dated 2/27/09 re FTC letter re stop reporting

27. Emails: Cucurullo, Oliver, Pasch, Keezer dated 2/26/09 w/attached FTC Counter Settlement Offer Methodology and Settlement Worksheet dated 2/11/09

28. Emails: Oliver, Cucurullo dated 4/8/09 re "a few thoughts"

29. Emails: Pasch, Cucurullo, Senior Partners, Oliver dated 4/13/09 re FTC Settlement Conference

30. Emails: Cucurullo, Oliver dated 4/15/09 re FTC Settlement Summary dated 4/15/09

31. Privileged & Confidential: Summary of 'Talking Points" for 4/17/09 Settlement Conference

32. Emails: Cucurullo, Oliver dated 4/17/09 re fighting & weakening their case

33. Emails: Oliver, Greenfeld, dated 9/17/08 w/attached Opinion Ltr PA from Errol dated 1/3/04 & PMC Opinion Ltr CO from Errol dated 11/3/04

34. Privilege Log of CDG, Pasch & Keezer dated 3/18/13 or USA vs. CDG

35. Emails: Cucurullo, Greg L dated 2/5/04 re Indiana FOP scripts

36. Memo from Errol to Pasch & Cucurullo dated 1/12/05 re Indiana meeting

37. Emails: Cucurullo, Errol, Pasch dated 1/15/15 w/attached INFOP PMC K 1/15/05

38. Memo from Errol to Pasch dated 1/18/05 re Indiana employees

39.   Emails:  Cucurullo, Pasch, Errol, Keezer dated 1/19/05 re definition of employee

40.   Memo from Errol to Pasch dated 1/26/05 re Indiana

41.   Emails:  Pasch, Errol, Cucurullo, Keezer dated 1/27/05 re Indiana PMC

42.   Memo from Errol to Pasch & Cucurullo dated 2/7/05 re State of Indiana – S.B. 424

43.   Memo from Errol to Pasch & Keezer dated 3/3/05 re State of Indiana – bona fide employee

44.   Memo from Errol to Pasch dated 4/6/05 re Indiana FOP issues

45.   Memo from Errol to Pasch & Cucurullo dated 1/31/06 re State of CT

46.   Emails:  Cucurullo, Errol, Pasch dated 1/31/06 re CT FOP

47.   Emails:  Pasch, Flynn, Tallberg, Errol dated 2/13/06 re Meeting this Wed with AG

48.   Privileged & Confidential:  US vs. CDG – Summary Judgment Outline

49.   Emails:  Oliver, Sherwood, Levithan dated 5/12/09 re follow-up questions re D&O insurance & Chubb

50.   Emails:  Greenfeld, Oliver dated 5/18/09 re CDG

51.   Emails:  Oliver, Cucurullo dated 5/18/09 re US vs. CDG – Economic Expert Report

52.   Emails:  Oliver, Pasch, Strenio dated 5/19/09 re Alert

53.   Emails:  Strenio, Pasch dated 5/19/09 re Alert

54.   Emails:  Cucurullo, Oliver dated 5/21/09 re Important Employee Communication

55.   Report prepared by David Schweiger for Mark Josephs, USDept of Justice in the Matter of USA vs. CDG, Scott Pasch & David Keezer

56.   Emails:  Pasch, Cucurullo, Senior Partners, Oliver dated 5/29/09 re CA released their list on Operation False Charity

57.   Emails:  Oliver, Cucurullo dated 6/1/09 re CA released their list on Operation False Charity

58.   Emails:  Oliver, Pasch, Cucurullo, Keezer dated 7/7/09 - 7/8/09 re Draft Summary Judgment Brief

59.   Emails:  Pasch, Oliver dated 7/10/09 re latest draft

60.   Emails:  Cucurullo, Oliver dated 7/9/09 re EEOC FYI

61.   Ltr dated 7/16/09 from Bruce Kagen of US Equal Employment Opportunity Commission to Peter Guattery, Esq. re Ishimaru, et al. vs. CDG

62.   Emails:  Pasch, Greenfeld, Keezer, Cucurullo, Strenio, Himmel, Oliver, Fiorica dated 7/16/09 re US vs. CDG

63.   Emails:  Cucurullo, Oliver, Senior Partners dated 9/17/09 re Andy & next steps

7302515.1

64. Emails:  Oliver, Cucurullo, Pasch, Keezer, Greenfeld dated 9/28/09 w/attached DVA documents

65. Emails:  Pasch, Oliver, Greenfeld Pasch, Keezer dated 9/28/09 re DVA documents

66. Emails:  Cucurullo, Oliver dated 9/28/09 re DVA documents

67. Emails:  Cucurullo, Pasch, Oliver, Strenio, Greenfeld, Fiorica, Keezer, Zerwitz dated 9/28/09 re update re settlement

68. Emails:  Cucurullo, Oliver, Strenio, Greenfeld, Pasch, Fiorica, Keezer, Zerwitz dated 9/25/09 – 9/26/09 re update on WARN notice

69. Emails:  Oliver, Cucurullo dated 10/5/09 re pretrial order

70. Emails:  Oliver, Pasch, Cucurullo, Keezer, Strenio, Himmel, Zerwitz, Greenfeld, Fiorica dated 10/12/09 re pretrial conference

71. Emails:  Oliver, Cucurullo dated 10/12/09 re pretrial conference

72. Emails:  Pasch, Oliver, Cucurullo, Keezer, Strenio, Himmel, Zerwitz, Greenfeld, Fiorica dated 10/12/09 re pretrial conference

73. Emails:  Oliver, Cucurullo dated 10/23/09 re Privileged & Confidential

74. Email: Pasch, Brookreson, Oliver dated 10/26/09 w/attached US vs. CDG message

75. Ltr dated 10/30/09 from Matthew Wilshire to Judge Hochberg re US vs. CDG settlement conference scheduled for 11/9/09

76. Emails:  Oliver, Pasch, Cucurullo, Strenio, Himmel, Zerwitz, Greenfeld, Fiorica dated 11/3/09 re Draft Settlement Conference Statement

77. Emails:  Greenfeld, Oliver dated 11/3/09 re CDG

78. Confidential:  Ltr dated 11/4/09 from Michael Himmel of Lowenstein Sandler to Judge Hochberg - Settlement Conference Statement

79. USA vs. CDG, Pasch & Keezer – Plaintiff's Settlement Conference Statement dated 11/4/09

80. Emails:  Levithan, Pasch, Keezer, Oliver, Sherwood dated 11/4/09 re Privileged & Confidential

81. Privileged & Confidential:  "Talking Points" for 11/9/09 Settlement Conference

82. Emails:  Oliver, Himmel, Strenio, Pasch, Keezer, Cucurullo dated 11/10/09 re settlement conference

83. Emails:  Pasch, Oliver, Cucurullo, Himmel, Strenio, Keezer dated 11/10/09 re settlement conference

84. Emails:  Strenio, Oliver, Cucurullo, Himmel, Pasch, Keezer dated 11/10/09 re settlement conference

85. USA vs. CDG – Order of Judge Hochberg dated 11/17/09

86.     Email:  Oliver, Himmel dated 11/17/09 w/attached US vs. CDG message

87.     Email:  Pasch, Oliver, Keezer, Himmel dated 12/8/09 re Privileged & Confidential

88.     Emails:  Keezer, Pasch, Oliver, Himmel, Zerwitz, Strenio dated 12/9/09 re Update on strategy

89.     Emails:  Strenio, Pasch, Oliver, Himmel, Zerwitz, Keezer dated 12/9/09 - 12/11/09 re update increasing offer

90.     Emails:  Pasch, Levithan, Keezer, Oliver dated 12/11/09 re Statement dated 12/7/09

91.     Emails:  Levithan, Pasch, Keezer, Oliver, Himmel dated 12/15/09 re Statement dated 12/7/09 & Scope of Work

92.     Emails:  Pasch, Cucurullo, Levithan, Oliver, Sherwood, Strenio, Keezer dated 1/3/10 re CDG – Strategy conference call request

93.     Emails:  Oliver, Strenio, Himmel, Greenfeld dated 1/3/10 re update FTC counter offer

94.     Emails:  Pasch, Oliver, Keezer, Levithan, Himmel dated 1/6/10 re Privileged & Confidential – treatment program for serious health issues

95.     Emails:  Levithan, Pasch, Keezer, Himmel, Oliver dated 1/6/10 re Privileged & Confidential – attempt to delay trial

96.     Emails:  Cucurullo, Oliver, Himmel, Levithan dated 1/6/10 - 1/7/10 re Privileged & Confidential – path of company liability

97.     Emails:  Oliver, Blackwell dated 1/14/10 re settlement & trial

98.     Emails:  Pasch, Oliver, Greenfeld, Himmel dated 1/25/10 re tomorrow's settlement conference strategy

99.     Emails:  Pasch, Oliver dated 1/25/10 re Privileged & Confidential – making case on DVA

100.    Emails:  Oliver, Greenfeld, Pasch, Cucurullo, Strenio, Keezer, Himmel, Fiorica, Long, Michael, Lloyd, Zerwitz, Strenio dated 1/25/10 re tomorrow's settlement conference strategy

101.    Emails:  Strenio, Himmel, Oliver dated 1/27/10 re Privileged & Confidential – settlement offer negotiation

102.    Emails:  Strenio, Pasch, Oliver, Himmel dated 1/27/10 re Privileged & Confidential – settlement offer negotiation

103.    Email:  Oliver, Greenfeld, Long, Fiorica, Lloyd, Cross, Himmel, Levithan dated 1/27/10 re CDG – case settled

104.    Email:  Oliver, Errol dated 1/27/10

105.    Emails:  Oliver, Josephs, Buro dated 1/27/10 re USA vs. CDG – conference call

106.    Emails:  Greenfeld, Oliver, Pasch, Strenio, Himmel dated 1/28/10 re settlement certification

107.  USA vs. CDG – Certification Agreement dated 1/28/10

108.  7/11/02 EC Memo to Leo Blackwell re: IN FOP

109.  May '03 email and AC notes re: MIPOA Consulting Model

110.  May '03 MIPOA agreements drafted by EC

111.  Jan '04 emails b/w SP and EC re: 1-page amdt

112.  1-31-04 INFOP 1-page contract addendum

113.  2-5-04 emails b/w AC and Lam

114.  PMC Overview

115.  3-22-04 Marketing Materials sent to LA by SP

116.  8-24-04 Marketing Materials sent to NY by SP

117.  8-24-04 Marketing Materials sent to NY by LO

118.  8-24-04 Marketing Materials sent to LA by LO

119.  8-24-04 Marketing Materials sent to TN by LO

120.  8-30-04 Marketing Materials sent to CO by LO

121.  8-30-04 Marketing Materials sent to RI by LO

122.  9-13-04 Marketing Materials sent to AL by LO

123.  12-20-04 Marketing Materials sent to PA by LO

124.  12-14-04 Marketing Materials sent to RI by LO

125.  PMC PowerPoint Slides

126.  10-28-04 emails b/w AC and SP

127.  1-28-05 emails b/w AC and EC re: INFOP revised agrmt

128.  6-16-05 revised INFOP agrmt

129.  Feb '07 exchange w/ Lee Tager re: 100%

130.  March '07 UT script w/ 100%

131.  5-15-06 emails JH and AC re: discipline

132.  8-8-06 emails; LO re: discipline

133.  12-29-06 emails; AC and SL re: discipline

134.  3-26-07 emails; LO re: discipline

135.  7-13-05 emails; JH and AC re: discipline

136.  12-27-05 emails; JH & AC re: discipline

137.  7-6-07 emails; AC, SP, DK,EC re: history of PMC

138.  7-31-07 SP email to EC, AC, DK re: 100%

139.  Nov '07 script complaints in Arkansas

140.  12-13-07 emails w/ Tager re: 100%

141.   3-17-08 notice of closing Ark.

142.   3/'08 emails b/w SP and Hamby re Ark. probs.

143.   3/'08  AC response to Gov't. request for more info

144.   6-30-08 email of AC to MO and SP/DK re: thoughts

145.   6-17-08 AC Memo to clients

146.   9-25-08 AC email to MO re: dirty laundry

147.   2-16-09 AC Memo to Clients

148.   4-20-09 AC email to MO re: 100% analysis

149.   4-24-09 AC email to MO re: 100% analysis

150.   5-5-09 AC email to MO re: Analysis and "living hell"

151.   7-9-09 AC email to all re: chronology of 100%

152.   PMC Collections by Year

153.   4-20-10 emails b/w AC and EC re: work reference

154.   2-24-11 emails b/w EC and SP re: referral

155.   6-28-11 emails b/w EC and SP re: new investment

156.   12-13-11 emails b/w EC and DK re: Scottsdale

157.   CDG Financial Recap (underlying Ex. D245)

158.   12-31-08 Promissory Note to SP

159.   12-31-08 Promissory Note to DK

160.   Alyce Cucurullo Dep. in FTC case

161.   Pre Lawsuit Chronology

162.   4-30-97 EC letter to SP and DK re: Consent Order

163.   2-12-98 letter of EC to DK & SP forwarding revised Agree & Consent Order

164.   Signed Consent Order

165-167   Keezer $ info

168-170   Pasch $ info

171.   Pam Seman Dep

172.  Plaintiff's responses to Defendants' Requests for Admissions

173.  Plaintiffs' responses to Defendants' Interrogatories in the legal malpractice action

174.  Expert report and CV of Lustigman

175.  Expert report and CV of Lesovitz

176.  Legal Bills invoiced by Copilevitz & Canter, LLC

177.  Website pertaining to Matthew Oliver, Esquire

7302515.1

(https://www.lowenstein.com/moliver/)

178.  September 24, 2007 FTC Press Release as to 2007 FTC Complaint.

179.  March 18, 2009 Cover and page 18 of CDG consolidated and combined financial statements Y/E December 31, 2008 and 2007.

180.  March 31, 2010 FTC Press Release as to settlement of 2007 FTC Complaint.

181.  Underlying motion for summary judgment, and exhibits, by U.S. Gov't.

182.  Underlying motion for summary judgment, and exhibits, by Pasch and Keezer

183.  Underlying final pretrial order

184.  January 2004 emails between Pasch, Alyce, and EC (Plaintiff Dep Ex. P-30)

185.  April 13, 1994; New Jersey; Consent Order

186.  April 30, 1994; Minnesota; Consent Judgment

187.  March 30, 1995; New York; Assurance of Voluntary Compliance

188.  June 22, 1995; Connecticut; Stipulation for Judgment

189.  August 24, 1995; Louisiana; Assurance of Voluntary Compliance

190.  1995; Indiana; Assurance of Voluntary Compliance

191.  March 20, 1996; Massachusetts; Judgment

192.  April 2, 1996; New York; Assurance of Discontinuance (stipulation)

193.  June 4, 1996; Mississippi; Assurance of Voluntary Compliance

194.  October 16, 1996; Louisiana; Assurance of Voluntary Compliance

195.  May 21, 1997; Idaho; Judgment

196.  May 1997; North Carolina; Assurance of Voluntary Compliance

197.  October 30, 1997; New Jersey; Judgment

198.  December 31, 1997; Washington State; Judgment

199.  February 11, 1998; Ohio; Judgment

200.  June 8, 1998; (FTC); Judgment and Consent Order

201.  June 15, 1998; Kansas; Journal Entry Consent Judgment

202.  June 25, 1998; Pennsylvania; Assurance of Voluntary Compliance

203.  August 10, 1998; Washington State; Stipulated Judgment

204.  October 20, 1998; Georgia; Assurance of Voluntary Compliance

205.  November 6, 1998; Utah; Assurance of Voluntary Compliance

206.  December 10, 1998; South Carolina; Voluntary Consent Agreement (VCA)

207.  September 11, 1999; Pennsylvania; Assurance of Voluntary Compliance

208.  November 8, 1999; Oklahoma; Assurance of Voluntary Compliance

209.  November 29, 1999; Mississippi; Consent Agreement

210.  November 29, 1999; New Jersey; Assurance of Voluntary Compliance

211.  New Jersey Amended Verified Complaint

212.  September 27, 2000; Idaho; Assurance of Voluntary Compliance

213.  November 14, 2000; Maine; Consent Decree

214.  State of Maine Complaint

215.  January 22, 2001; Vermont; Consent Decree

216.  Vermont Amended Consumer Fraud Complaint

217.  August 6, 2002; Kansas; Journal Entry of Consent Judgment

218.  August 12, 2002; Minnesota; Settlement and Consent Judgment

219.  February 25, 2003; Mississippi; Sec. State (Admin) – Cease/Desist

220.  January 17, 2005; Utah; Assurance of Voluntary Compliance

221.  January 5, 2008; Oregon; Assurance of Voluntary Compliance

222.  Oregon Notice of Unlawful Practices

223.  February 11, 2009; Ohio; Discontinuance

224.  State of Ohio Complaint

225.  Vermont newspaper article (CC13193-13194)

226.  6/13/03 letter from State of NC to David Keezer (CC15179)

227.  2/26/04 letter from Pasch to Woody Hayes (CC15286)

228.  4/3/03 email from Pasch to Copilevitz (CC15554)

229.  10/17/00 memo from Copilevitz to Pasch (CC12153)

230.  9/13/02 emails (CC14279-14280)

231.  Summary of Development – The Indiana Model (CC01016-01017)

232.  11/7/07 memo (CC01521-1531)

233.  Professional fundraising consultant registration (CC00669-680)

234.  6/6/07 emails (CC00681)

235.  5/17/07 newspaper article (CC00774-777)

236.  10/12/09 Strenio email

237.  1/23/03 Copilevitz memo

238.  CDG and related companies' bankruptcy filings

239.  All financial records

240.  Pasch and Keezer individual tax returns

241.  Demonstrative exhibits

242.  All documents designated by Plaintiffs

Defendants request leave to supplement to correct inadvertent omissions or add newly discovered documents.

7302515.1